# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

HERAUD ST. LOUIS, et al.,

                Petitioners-Plaintiffs,

v.                                             Case No. 2:20-cv-349

JIM MARTIN, etc., et al.,

                Respondents-Defendants.

## PETITIONERS-PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

Pursuant to Local Rule 4.05, Petitioners-Plaintiffs ("Plaintiffs") move for a temporary restraining order barring their transfer during the pendency of this action, and, additionally, ordering their immediate release from continued detention at the Glades County Detention Center ("Glades"), the Baker County Detention Center ("Baker"), and Krome Service Processing Center ("Krome") during the COVID-19 pandemic, and in support thereof state as follows:

Plaintiffs are civil immigration detainees at Glades, Baker and Krome who, due to their age and/or preexisting medical conditions, are at substantial risk of severe illness or death should they contract COVID-19—a highly infectious disease with no cure or vaccine. On May 12, 2020, they filed this action, seeking immediate release because the fact of their detention unnecessarily places them at substantial risk of infection with COVID-19, as they are unable to comply with public health guidance for mitigating the risks of COVID-19.

On May 15, one Plaintiff was transferred on less than 24 hours' notice to Krome, where there were at least eleven confirmed cases of COVID-19 among detainees (and at least eight among staff). Defendants have further threatened to both deny release to and transfer "far away" at least one other Plaintiff in retaliation for filing this suit. This threat is credible: after Plaintiffs

initially filed in the Southern District challenging their detention at Glades (dismissed for refiling in this court), Defendants transferred, without notice, two Plaintiffs to Baker. Such retaliation is unconstitutional. Moreover, the conditions of the transfers, including to Krome and Broward Transitional Center (BTC), where there were two confirmed cases of COVID-19 on May 12, violate due process. Conditions at Glades, Baker, Krome, and BTC have quickly worsened. Today, there are nineteen cases of COVID-19 among detainees at BTC, and thirteen at Krome.

A TRO from this Court, to maintain the health and safety of Plaintiffs as they continue to pursue their immigration cases, is urgently necessary. Plaintiffs, as detained individuals seeking to enforce their civil rights, request that this Court exercise its discretion to require no security in issuing this relief. *See Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 303 (5th Cir. 1978). A proposed form of temporary restraining order is attached.

WHEREFORE, Plaintiffs respectfully request that this Court immediately issue a temporary restraining order barring their transfer or ordering their immediate release.

## MEMORANDUM OF LAW

### INTRODUCTION

Plaintiffs are civil immigration detainees who, pursuant to the Due Process Clause of the Fifth Amendment, seek a TRO barring their transfer and, additionally, ordering their immediate release from continued detention at the Glades, Baker, and Krome during the COVID-19 pandemic.

Due to their ages and/or underlying medical conditions—including emphysema, diabetes, high blood pressure, obesity, neurological disorders, and asthma—Plaintiffs are at high risk of severe illness or death should they contract COVID-19. It is a highly infectious disease that spreads easily in crowded and unsanitary enclosed environments like Glades, Baker, and Krome.

According to public health experts, the only way to minimize the risks of COVID-19 is to avoid infection in the first place by maintaining a distance of at least six feet from others and engaging in heightened hygiene. Outside of detention, much of day-to-day life has been transformed. But Plaintiffs cannot follow these basic public-health directives: they are kept in close quarters with dozens of other people and cannot socially distance; in addition, they lack access to the personal items, like masks and even soap, necessary for hygiene. Prevention is equally impossible during any transfer between detention facilities, as detainees are escorted in handcuffs and forced to stand, waiting, in cramped rooms in groups of 20 to 35 people, before being placed on cramped buses in close proximity to one another for hours—all without masks, toilet paper, hand sanitizer, or other hygiene products. And at least one Plaintiff has been transferred *into* a facility with confirmed cases of COVID-19. Meanwhile, Defendants are failing to provide sufficient screening and testing for COVID-19 at their facilities.

Plaintiffs are at substantial risk of a fatal encounter with COVID-19 every day that they remain in detention and any time they transfer. Both options threaten to turn Plaintiffs' civil detention into a death sentence. *See, e.g.*, Ex. 1 to Dkt. 1-15 (Kacou Decl.) (*First ICE detainee dies from COVID-19 after Being Hospitalized from Otay Mesa Detention Center*, San Diego Tribune (May 6, 2020)). Due process, which forbids unnecessarily placing detainees at substantial risk of severe illness or death, requires Plaintiffs' immediate release and the end to their transfers. In addition to individual-rights concerns, public health favors Plaintiffs' release: Plaintiffs will require intensive treatment if they become seriously ill, further taxing the local healthcare system.

Courts across the country have recognized that continuing to detain particularly vulnerable individuals while the COVID-19 pandemic rages on violates the Fifth Amendment.

And federal courts in Florida have granted compassionate release for the same "extraordinary and compelling" reasons. *United States v. Hernandez*, 1:16-cr-20091, ECF 561 (S.D. Fla. Apr. 3, 2020); *see also United States v. Oreste*, 1:14-cr-20349, ECF 200 (S.D. Fla. Apr. 6, 2020).

Plaintiffs respectfully request that this Court immediately issue a TRO barring their transfer and ordering their temporarily release from custody, so that they may avoid infection from COVID-19.

## BACKGROUND

### I.    Plaintiffs are at Substantial Risk of Serious Illness or Death if They Contract COVID-19.

As of May 19, 2020, at least 1,477,516 people in the United States have tested positive for COVID-19, and at least 89,272 have died (compared with 42,302—less than half as many— on April 20). Dkt. 1-1 (Graves Decl.) ¶ 4; *United States of America*, World Health Org. (May 19, 2020), https://covid19.who.int/region/amro/country/us. In Florida, as of May 18, 2020, there were at least 46,442 reported cases and 1,997 deaths (compared with 839 deaths on April 21). Graves Decl. ¶ 5; *Florida COVID-19 Response*, Fla. Health (May 18, 2020), https://floridahealthcovid19.gov.

COVID-19 kills close to one in seven people and, even for those who survive it, it can cause severe organ damage, diminishing individuals' lung and heart capacity permanently. Graves Decl. ¶¶ 4, 8, 10. The risks are particularly acute for older people and those with certain underlying medical conditions—including blood disorders, cardiovascular disease, diabetes, chronic respiratory disease, cancer, chronic kidney or liver disease, compromised immune systems, neurological conditions, and more. Dkt. 1-2 (Amon Decl.) ¶ 8.

Plaintiffs are particularly vulnerable to serious illness or death if they contract COVID-19 due to their ages and/or preexisting medical conditions. Amon Decl. ¶¶ 11-17; Graves Decl. ¶¶ 25-

4

31. **Heraud St. Louis**, a 40-year-old father of four, suffers from diabetes and high blood pressure and has a history of kidney failure. Dkt. 1-8 (St. Louis Decl.) ¶¶ 1, 3 5-7. He went into a diabetic coma mere weeks before this suit was filed. *Id.* ¶ 5. **Luis Macias Arredondo** is a 41-year-old father of three, who has been hospitalized as a result of his spinal disorders, suffers from hypertension, and is a former smoker. Dkt. 1-13 (Arredondo Decl.) ¶¶ 1, 2, 5-6, 10. **Theophilus Bucknor** is a 62-year-old man who suffers from type II diabetes. Dkt. 1-9 (Bucknor Decl.) ¶¶ 1, 3. **Wilkens Dorival** is a 24-year-old father who suffers from obesity and high blood pressure. Dkt. 1-10 (Dorival Decl.) ¶¶ 1-3. **Mark Anthony Montaque** is a 54-year-old husband and father of two, who suffers from emphysema and is HIV positive. Dkt. 1-11 (Montaque Decl.) ¶¶ 1, 5, 6. **Lennox Robinson** is a 26-year-old father and business owner who has had moderate to severe asthma since childhood, for which he has been hospitalized multiple times. Dkt. 1-12 (Robinson Decl.) ¶¶ 1-4. **Romaine Wilson** is a 26-year-old father who suffers from grand mal seizures due to a traumatic brain injury he suffered after being shot in the head in June 2016. Dkt. 1-14 (Wilson Decl.) ¶¶ 1, 2, 4. Thus, Plaintiffs are particularly vulnerable to the dangers of COVID-19.

## II.    Conditions at Glades, Baker, and Krome Place Plaintiffs at Substantial Risk of Infection With COVID-19.

COVID-19 is remarkably contagious. It spreads through the respiratory droplets that infected individuals produce when they cough or sneeze. Amon Decl. ¶ 18. COVID-19 can also spread when individuals touch a surface or object that has the virus on it. *Id*. Because there is no known treatment, much less a vaccine, for the disease, the only known method of preventing serious complications from COVID-19 is to prevent infection in the first place. Graves Decl. ¶ 11; Amon Decl. ¶ 6. Minimizing the risk of infection requires people to "socially distance" by staying at least six feet away from others, to wash their hands regularly, to sanitize surfaces frequently, and to wear masks and gloves. Graves Decl. ¶ 11; Amon Decl. ¶¶ 20.

Emphasizing the importance of social distancing, all 50 states and territories across the country have issued emergency public health orders aimed at minimizing contact between people. Amon Decl. ¶ 21. Florida Governor Ron DeSantis has shut down schools and non-essential businesses and urged people to stay home and avoid in-person contact. *Id.* And CDC guidance instructs all people to maintain six feet of distance from others. Amon Decl. ¶¶ 18; Graves Decl. ¶ 11. The same guidance applies to those who are incarcerated or detained. *Id*. ¶ 18.

The fact of Mr. St. Louis', Mr. Arredondo's, Mr. Montaque's, Mr. Robinson's, and Mr. Wilson's detention at Glades, Mr. Bucknor's detention at Baker, and Mr. Dorival's detention at Krome denies Plaintiffs the opportunity to follow these directives. *See* Amon Decl. ¶ 33. People held at Glades and Baker live in close quarters—often sleeping with three to five other people in the same room, separated by just one to three feet. Robinson Decl. ¶ 9; Wilson Decl. ¶ 8; Dkt. 1-7 (Lopez Decl.) ¶ 6; Bucknor Decl. ¶¶ 11-12. At Glades, detainees are forced to share communal bathrooms with over 90 people, including a small number of sinks, toilets, urinals, and showers. Dorival Decl. ¶ 14; Wilson Decl. ¶ 19; Robinson Decl. ¶ 11. At both facilities, detainees eat and socialize in a single room, at communal tables, sitting just inches from others. Bucknor Decl. ¶ 13; St. Louis ¶ 14; Montaque Decl. ¶ 11; Arredondo Decl. ¶ 15. At Baker, detainees have no access to outdoor space, while, at Glades, the common outdoor space is crowded. Montaque Decl. ¶¶ 10.

Meanwhile, at Krome, there were already two confirmed cases among detainees (eight among detention staff) nearly one month ago, with 350 individuals being cohorted together after being exposed. *See Gayle v. Meade*, No. 20-cv-21553, Dkt. 53-1 (S.D. Fla. Apr. 21, 2020); *id.*, Dkt. 33-1 (S.D. Fla. Apr. 16, 2020). Today, notwithstanding Defendants' alleged adoption of guidelines to mitigate the spread in ICE facilities, ICE is reporting 13 new confirmed cases

among detainees there (with 19 cases at the nearby BTC—up from just two one week ago). *See* Ex. 9 to Dkt. 1-15 *ICE Guidance on COVID-19*, https://www.ice.gov/coronavirus. Krome is also the site of constant transfers, regularly exposing detainees housed there to new potential vectors of COVID-19—and those housed in other facilities to vectors from Krome. *See, e.g.,* Dkt. 1-3 (Conlin Decl.) ¶ 16; St. Louis Decl. ¶ 9; Bucknor Decl. ¶ 4.

The hygiene and sanitation practices necessary to fight COVID-19's spread are equally impossible inside Glades and Baker. CDC guidance instructs everyone—including those who are detained—to wash their hands often, with soap and water, and directs detention centers to provide detainees with free soap, running water, hand dryers or paper towels. Graves Decl. ¶ 20. But, at Glades and Baker, ICE has failed to ensure that detainees are provided with basic hygiene items, including hand sanitizer and sufficient amounts of soap. Instead, detainees only receive small amounts of soap no more than twice per week, which is inadequate for both handwashing and showering. St. Louis Decl. ¶ 17; Bucknor Decl. ¶ 8; Lopez Decl. ¶ 9; Arredondo Decl. ¶ 16; Dorival Decl. ¶ 14; Robinson Decl. ¶ 12, 15.

Similarly, CDC guidance instructs everyone—including people who are incarcerated or detained—to at least wear masks where social distancing is not feasible, and to wear masks and gloves when cleaning spaces where a person with a suspected case of COVID-19 has been. Amon Decl. ¶ 41. But detainees do not have sufficient access to masks. Arredondo Decl. ¶ 18; Conlin Decl. ¶¶ 8, 18. And ICE employees and contractors at both facilities, who can serve as vectors of the disease from outside of the facility, regularly do not wear masks or gloves when interacting with detainees. Dorival Decl. ¶ 24; Bucknor Decl. ¶ 17; Dkt. 1-6 (Bilbao Decl.) ¶ 4.f; St. Louis Decl. ¶ 20; Robinson Decl. ¶ 15; Wilson Decl. ¶ 13; *see also* Graves Decl. ¶ 25.

The infection may already be inside Glades and Baker, as other detainees are exhibiting symptoms consistent with COVID-19. St. Louis Decl. ¶ 19; Lopez Decl. ¶ 7; Conlin Decl. ¶ 13; Arredondo Decl. ¶¶ 14-15; Dorival Decl. ¶¶ 15-16; Wilson Decl. ¶ 14. The lack of confirmed cases proves nothing given the general scarcity of testing, which ICE acknowledges. Graves Decl. ¶¶ 5-6; Ex. 10 to Dkt. 1-15 (*ICE Plans to Increase COVID-19 Testing as Haiti Commission Calls for Pause in Deportations*).

Each facility present an ideal environment for COVID-19 to spread. They are enclosed, much like the cruise ships, nursing homes, and jails and prisons that have been epicenters of the disease. *See* Amon Decl. ¶¶ 28, 42-43; Michael Irvine et al., *Modeling COVID-19 and Impacts on U.S. Immigration and Enforcement (ICE) Detention Facilities*, J. Urban Health (in press) (predicting that 72-99% of ICE detainees will become infected within 90 days).

Further, ICE has continued to transfer—without testing—detainees between facilities, including facilities, like Krome, with confirmed COVID-19 cases. *See* Bucknor Decl. ¶ 10; Dorival Decl. ¶ 17; Conlin Decl. ¶ 16; Dkt. 1-5 (Paniagua Decl.) ¶ 6; Bilbao Decl. ¶ 6; Lopez Decl. ¶ 5. Mr. Bucknor and Mr. Dorival were both transferred from Glades to Baker on April 28; during the process, they were held in close contact in a holding room with 20 other detainees, before being put on a bus just a couple of feet from others. Amon Decl. ¶ 43. No one was given a mask. Bucknor Decl. ¶ 10. Since then, Mr. Dorival has been transferred to Krome. Ex. 1 (Supp. Kacou Decl.) ¶ 2.

This is despite the fact that "[t]ransfer . . . risks spread of infection." Amon Decl. ¶ 38.b; *id.* ¶ 42. DHS' own medical experts have warned that "[t]ransferring detainees between facilities should be kept to an absolute minimum. The transfer puts the immigrants being transferred, populations in new facilities, and personnel all at increased risk of exposure." Ex. 14 to Dkt. 1-15

8

(*Letter from Dr. Scott Allen and Dr. Josiah Rich*). As other courts have recognized, "the chances of a more dangerous outbreak [at each facility] would rise were additional detainees to be added to the mix." *Celimen Savino v. SouzaSavino II*, 2020 WL 2404923, at *6 (D. Mass. May 12, 2020) (hereinafter *Savino II*). And ICE has acknowledged that '[t]he combination of a dense and highly transient detained population presents unique challenges for ICE efforts to mitigate the risk of infection and transmission.'" *Id*. (alteration in original) (quoting Mem. from Enrique M. Lucero, ICE, to Detention Wardens & Superintendents 1 (Mar. 27, 2020), available at https://www.ice.gov/doclib/coronavirus/attF.pdf).

Despite these dangerous circumstances, Defendants' response to mitigate the threat of COVID-19 has been "lethargic." *Fraihat v. U.S. Immigration & Customs Enf't*, No. 5:19-cv-01546, Dkt. 150 at 5 (E.D. Cal. May 15, 2020). According to ICE, out of the only 2,172 detainees tested nationwide as of May 18, there were already 1,073 confirmed cases—or nearly 50%. Ex. 9 to Dkt. 1-15 (*ICE Guidance on COVID-19*, https://www.ice.gov/coronavirus). Release from detention is the ***only*** way to protect Plaintiffs at this time. DHS's own medical experts, warning that COVID-19 poses an "imminent risk to the health and safety of immigration detainees," have publicly recommended that ICE release vulnerable individuals, including those with underlying health conditions. Ex. 14 to Dkt. 1-15 (*Letter from Dr. Scott Allen and Dr. Josiah Rich*) at 3, 5-6). The former Acting Director of ICE, John Sandweg, has similarly stated that "ICE can, and must, reduce the risk [COVID-19] poses to so many people, and the most effective way to do so is to drastically reduce the number of people it is currently holding." Ex. 15 to Dkt. 1-15 (*I Used to Run ICE. We Need to Release the Nonviolent Detainees*). By virtue of its own screening and this lawsuit, ICE is on notice that Plaintiffs' medical conditions put them at high risk from COVID-19.Dkt. 1 ¶ 165.

**ARGUMENT**

A temporary restraining order should be granted where "the movant has established: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005).

Each prong of this test is satisfied here. The only way to accord due process is to immediately release Plaintiffs from detention. Conditions that expose people to life-threatening infectious disease are constitutionally intolerable, and the dangers that Plaintiffs face—severe illness and potential death—are quintessential irreparable harm. In addition, by preserving Plaintiffs' lives, health, and safety from contraction of COVID-19, a temporary restraining order in this case would "prevent the judicial process from being rendered futile by [Defendants'] action or refusal to act." *Canal Authority of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). There is also an overwhelming public interest in limiting the spread of COVID-19, both to minimize further infections and to reduce the strain on stressed healthcare systems. The balance of equities weighs heavily in favor of Plaintiffs, whose health and lives are at stake.

**I.      Plaintiffs Are Likely to Succeed on the Merits.**

As civil detainees, *see Zadvydas v. Davis*, 533 U.S. 678, 690 (2001), Plaintiffs must be afforded "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish," *Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); *accord Dolihite v. Maughon By and Through Videon*, 74 F.3d 1027, 1041 (11th Cir. 1996); *Perez v. Wicker*, No: 2:14-cv-558-FtM, 2016 WL 3543502, at  *2 (M.D. Fla. 2016).

Here, the conditions of Plaintiffs' civil detention violate, and any transfer to another detention facility would violate, their due process rights under any applicable framework. First,

10

the fact of their civil detention violates due process because the conditions are not reasonably related to a legitimate government goal and thus amount to impermissible punishment. The same is true for any transfers. Second, the reality of detention at Glades, Baker, and Krome and of transfers between facilities violate the professional-judgment standard applicable to civil detainees because the ongoing, life-threatening conditions are not, and cannot be, the product of an exercise of professional judgment. Third, because they also violate the deliberate-indifference standard, they necessarily violate Plaintiffs' due process rights.

### A.  The Conditions Constitute Unconstitutional Punishment.

Like pretrial detainees, immigration detainees cannot be subjected to punishment, consistent with due process. *See Zadvydas,* 533 U.S. at 690; *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004). An intent to punish, which "suffices to show unconstitutional pretrial punishment," "may be inferred when a condition of pretrial detention is not reasonably related to a legitimate government goal . . . ." *McMillian v. Johnson*, 88 F.3d 1554, 1564 (11th Cir. 1996), *opinion amended on reh'g*, 101 F.3d 1363 (11th Cir. 1996); *accord Magluta*, 375 F.3d at 1273. Thus, Plaintiffs cannot be held in conditions that bear no reasonable relationship to a legitimate governmental interest. *See Jacoby v. Baldwin Cty.*, 835 F.3d 1338, 1345 (11th Cir. 2016).

Plaintiffs' conditions of civil confinement are not reasonably related to a legitimate governmental goal; nor is the threat of transfer to another facility. The spread of COVID-19 is imminent, and neither Glades nor Baker appears to be testing detainees for COVID-19—even though individuals are exhibiting symptoms consistent with COVID-19. St. Louis Decl. ¶ 19; Bucknor Decl. ¶ 18; Arredondo Decl. ¶¶ 14-15; Dorival Decl. ¶ 16. Krome has already had at least 21 confirmed cases. *See Gayle*, No. 20-cv-21553, Dkt. 53-1 (S.D. Fla. Apr. 21, 2020); *id.*, Dkt. 33-1 (S.D. Fla. Apr. 16, 2020); *ICE Guidance on COVID-19*,

https://www.ice.gov/coronavirus. Where Plaintiffs eat, sleep, and bathe in shared spaces with dozens of other detainees, Plaintiffs cannot effectively socially distance. *See* Background I.

In the face of ample medical evidence that social distancing and hygiene are the only way to avoid COVID-19, detaining medically vulnerable Plaintiffs in close proximity to other detainees and without sufficient hygiene or sanitation serves ***no*** legitimate purpose—particularly given the number of tools ICE has available, beyond physical detention, to meet its enforcement goals. The availability and efficacy of these tools is demonstrated by the enforcement measures already used when people with serious medical conditions are released from detention.[1]

Nor is detention under these circumstances reasonably related to the enforcement of immigration laws. *See Unknown Parties v. Johnson*, 2016 WL 8188563, at *5 (D. Ariz. Nov. 18, 2016), *aff'd sub nom. Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017). In *Zadvydas*, the Supreme Court held that "[t]here is no sufficiently strong special justification . . . for indefinite civil detention." 533 U.S. at 690. If the government's interest in effectuating removal and protecting the community cannot justify indefinite detention, it also cannot justify the similarly "potentially permanent" medical harm and death that Plaintiffs could well face. *See id.* at 691.

Further, transfer to another facility, rather than release is likewise unconstitutional punishment because it, too, imposes dangerously crowded and unsanitary conditions on Plaintiffs, exposing them to the risk of serious illness or death. *See* Conlin Decl. ¶¶ 16, 23; Bucknor Decl. ¶ 10; Dorival Decl. ¶¶ 17-19; Amon Decl. ¶¶ 38.b, 42. It increases the chances of outbreak at every facility involved. *See* Drs. Allen and Rich Letter (advising against transfer);

---

[1] For example, ICE's conditional supervision program, ISAP (Intensive Supervision Appearance Program), relies on the use of electronic ankle monitors, biometric voice recognition software, unannounced home visits, employer verification, and in-person reporting to supervise participants. A government-contracted evaluation of this program reported a 99% attendance rate at all immigration court hearings and a 95% attendance rate at final hearings. U.S. Gov't Accountability Office, GAO-15-26, *Alternatives to Detention: Improved Data Collection and Analyses Needed to Better Assess Program Effectiveness* 30 (Nov. 2014), *available at* https://www.gao.gov/assets/670/666911.pdf.

*Savino II*, 2020 WL 2404923, at *6. Moreover, transfer to other facilities also constitutes unconstitutional punishment when the receiving facility has dangerous conditions—as when one Plaintiff was transferred to Krome, where there are confirmed COVID-19 cases. *See Gullatte v. Potts*, 654 F.2d 1007, 1014 (5th Cir. 1981).

### B.  Continuing to Detain Plaintiffs in Conditions Inconsistent with Public Health Guidance Does Not Constitute the Exercise of Professional Judgment.

Because Plaintiffs are civil detainees, their conditions of confinement cannot constitute "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Corpus v. Lamour*, No. 2:16-cv-620-FtM, 2018 WL 5221241, at *3 (M.D. Fla. Oct. 22, 2018) (quoting *Youngberg*, 457 U.S. at 323); *see also Hood v. Dep't of Children & Families*, 700 F. App'x 988, 990 n.1 (11th Cir. 2017) ("In evaluating liability, the district court utilized the 'deliberate indifference' standard under the Eighth Amendment. The district court should have used the 'professional judgment' standard from *Youngberg v. Romeo* because Hood is a civil detainee, not a prisoner.") (citation omitted).

Here, it is evident that no professional judgment was exercised in permitting the conditions that endanger Plaintiffs to exist. Not wearing masks, not wearing or changing gloves, all while in close proximity to, or touching, multiple detainees, puts detainees at substantial risk of serious harm. This necessarily means that detention staff are not exercising professional judgment when they fail to socially distance or wear protective equipment. This failure is made most clear in the facilities' security checks. As officers go from detainee to detainee, bunk to bunk, cell to cell, without masks or gloves, *see, e.g.*, Dorival Decl. ¶ 24; Bucknor Decl. ¶ 17; Bilbao Decl. ¶ 4.e and 4.f—or, if they do wear gloves, they do not change gloves between bunks, *see, e.g.*, St. Louis Decl. ¶ 20; Bucknor Decl. ¶ 9; Wilson Decl. ¶ 13—there is little question that

they are not exercising appropriate professional judgment. Even if medical staff approved this, such advice would violate Plaintiff's constitutional rights because it would represent a "substantial departure from accepted professional judgment." *Corpus*, 2018 WL 5221241, at *3 (quotation omitted). Random security checks may be part of the job, but they must be done in a way that does not threaten detainees' lives.

More broadly, Defendants have failed to exercise appropriate professional judgment regarding social distancing and hygiene among detainees at both Baker and Glades. Medically vulnerable detainees eat and sleep right next to other detainees—some displaying symptoms of COVID-19. They share a toilet and a sink—which are not cleaned adequately—with many dozens of others, and have access to very little soap. *See* Bucknor Decl. ¶¶ 5- 8, 1116; St. Louis Decl. ¶¶ 12-18; Lopez Decl. ¶¶ 6, 8, 9; Montaque Decl. ¶¶ 8-9, 11, 12; Dorival Decl. ¶¶ 13, 14, 20–22; Arredondo Decl. ¶¶ 13, 15, 16; Robinson Decl. ¶¶ 7-9, 11-15; Wilson Decl. ¶¶ 8-12; Conlin Decl. ¶ 4, 7, 11; Bilbao Decl. ¶ 4. This is obviously not safe. *See, e.g.*, Amon Decl. ¶ 21. It certainly does not comport with standard professional assessments of the needs of those who are medically vulnerable. *Id.* ¶¶ 31–43. Nor does it comport—even remotely—with the CDC guidelines *for correctional and detention facilities*, which take pains to accommodate the practical realities that burden facility administrators to the detriment of detainees' health. *E.g.*, Ex. 6 to Dkt. 1-15 ("Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities") at 9 (clean and disinfect common surfaces several times a day), 10 (provide adequate access to soap), 11 (implement six-foot social distancing, regardless of presence of symptoms).

It is no answer to note the CDC's acknowledgment that "[n]ot all strategies will be feasible in all facilities." *Id.* at 11. Indeed, that is precisely the point—Defendants cannot provide

for the safety of all detainees, which is why Plaintiffs must be released. Saying that there is a plan in place to isolate individuals who are exposed does not help Plaintiffs, because, to Plaintiffs, exposure itself may well mean death. Moreover, the feasibility of implementing CDC guidelines is entirely in the control of Defendants: unconstitutional conditions and the concomitant unconstitutional health risks do not become constitutional merely because the government has chosen to place a large number of individuals in civil detention, thus creating the circumstances the government says is so intractable to resolve. Whatever judgments are involved, the decisions are not the product of appropriate judgments concerning Plaintiffs health and safety. As civil detainees, Plaintiffs need only show that much.

Equally, transfer to another facility—which involves cramped and unsanitary conditions, *see* Conlin Decl. ¶¶ 16, 23; Bucknor Decl. ¶ 10; Dorival Decl. ¶¶ 17-19, and increases the possibility of COVID-19 spread at every facility, *see Savino II*, 2020 WL 2404923, at *6— would not reflect legitimate professional judgment. Contrary to the advice of public health and medical experts, such transfers introduce new vectors of disease and require movement of people in a single enclosed vehicle such that those people cannot practice the appropriate social distancing required to prevent transmission of COVID-19. Amon Decl. ¶¶ 38.b, 42.

**C. By Continuing to Detain and Transfer Plaintiffs in Conditions Inconsistent with Public Health Guidance, Defendants Are Deliberately Indifferent to the Unreasonable Risk of their Severe Illness or Death from COVID-19.**

If a condition of confinement violates prisoners' rights under the Eighth Amendment, it necessarily violates the rights of civil detainees as well. *See Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1573–74 (11th Cir. 1985). Here, Plaintiffs' claims need not, but in fact do, satisfy the more onerous deliberate indifference standard. To establish deliberate indifference, Plaintiffs must show that detention officials were "aware of a substantial risk of serious harm to pretrial

detainees" but did "not take reasonable measures to alleviate that risk." *Harper v. Lawrence Cty., Ala.*, 592 F.3d 1227, 1235 (11th Cir. 2010) (internal citation omitted). Negligence "does not suffice to satisfy this standard, but a prisoner need not show that the prison official acted with 'the very purpose of causing harm or with knowledge that harm would result.'" *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004). It is enough to show, for example, (1) knowledge of serious health risks and failure to address them; (2) delaying action to address those health risks for non-medical reasons; (3) grossly inadequate steps to address those health risks; (4) taking an easier but less efficacious course of action to address those health risks; or (5) action to address those health risks that is so cursory as to amount to no action at all. *See Baez v. Rogers*, 522 F. App'x 819, 821 (11th Cir. 2013) (citing *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)).

That standard is satisfied here. First, Plaintiffs have an objectively serious health risk. They all have serious health conditions, and contracting COVID-19 could very easily lead to their death. *See* Background I *supra*. The subjective inquiry is satisfied as well. Defendants know the risk, and they are disregarding it by conduct that is more than mere negligence. Defendant's knowledge is both implied and actual.

Deliberate indifference can be inferred from conditions that pose an "obvious" risk to health and safety. *McElligott*, 182 F.3d at 1255. We are in the midst of the worst pandemic in any of our lifetimes, and the entire state of Florida is under orders aimed to keep people physically apart. Amon Decl. ¶ 21. The risk to particularly vulnerable people detained in immigration detention facilities like Glades, Baker, and Krome, where COVID-19 is imminent if not already present and where they must constantly come into contact with others while often lacking face masks or adequate resources for hygiene, is "exceedingly obvious," as courts

recognized more than a month ago. *See, e.g.*, *Basank v. Decker*, _ F. Supp. 3d _, 2020 WL
1481503, at *5 (S.D.N.Y. Mar. 26, 2020) (ordering releases of people detained by ICE); *cf.*
*United States v. Garlock*, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (noting that "[b]y
now it almost goes without saying that we should not be adding to the prison population during
the COVID-19 pandemic if it can be avoided"). The same is true of the risks of transfer, as
DHS's own medical experts recognized as early as March. *See* Dr. Allen and Rich Letter. These
risks have only become more obvious, as detention facilities, jails, and prisons have emerged as
the primary source of major COVID-19 outbreaks in the country. Amon Decl. ¶ 44.

Furthermore, the record contains overwhelming evidence that Defendants are aware of
the risk posed by COVID-19 to Plaintiffs in particular. ICE has been aware of Plaintiff's
conditions for weeks. And ICE has acknowledged that underlying medical conditions that render
individuals vulnerable to COVID-19—including those that afflict Plaintiffs—can justify release.
*See* U.S. Immigr. and Customs Enforcement, *Memorandum on Coronavirus Disease 2019*
*(COVID-19) Action Plan, Revision 1* (Mar. 27, 2020),
https://www.ice.gov/doclib/coronavirus/attF.pdf. "[I]t is clear that ICE fully understands the
benefit of reducing the detainee population"; by failing "to commit to addressing the conditions
complained of, ICE has demonstrated deliberate indifference." *Gayle v. Meade*, No. 20-cv-
21553, 2020 WL 2086482, at *4 (S.D. Fla. Apr. 30, 2020).

Finally, Defendants' lack of action constitutes conduct more than mere negligence. The
government violates the Eighth Amendment when it crowds prisoners into cells with others who
have "infectious maladies," "even though the possible infection might not affect all of those
exposed." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). It acts with deliberate indifference when
it "ignore[s] a condition of confinement that is sure or very likely to cause serious illness." *Id.*

Here, that includes the conditions at Glades, Baker, and Krome, as well as the conditions of transfers. In addition, the categories of conduct establishing conduct more than mere negligence noted in *Baez* are present here: Defendants have knowledge of Plaintiffs' vulnerable state but fail to take reasonable steps to prevent infection. They don't appropriately wear protective equipment, and they choose not to clean. Crucially, ICE has acknowledged the insufficiency of its testing resources, and its response to the pandemic has been lethargic. *Fraihat*, No. 5:19-cv-01546, Dkt. 150 at 5 (E.D. Cal. May 15, 2020). Fully aware of the risks detention poses to Plaintiffs' health, Defendants continue to detain and transfer them.[2]

This Court would not be the first to hold that these conditions are unconstitutional. Indeed, in considering the claims of detainees at Glades and Krome, one court has already held that the government's failures in this facility "amount to cruel and unusual punishment because they are exemplary of deliberate indifference." *Gayle*, 2020 WL 2086482, at *4 (holding that conditions at Glades and Krome violate detainees' Fifth and Eighth Amendment rights).[3] And another district court has recognized that placing detainees at "substantial risk of contracting communicable diseases" can violate their due process rights. *See, e.g.*, *Cline v. Broward Cty. Sheriff's Office*, 2007 WL 2453558, at *3 (S.D. Fla. Aug. 23, 2007) (denying government's summary judgment motion on pretrial detainee's claim that allowing detainees who were not medically cleared to handle food and water consumed by others violated his due process rights).

---

[2] *Cf. Rosemarie M. v. Morton*, 671 F. Supp. 2d 1311, 1313-14 (M.D. Fla. 2009) (holding that a preliminary injunction "requiring [ICE] to authorize and provide [an immigrant detainee] with the appropriate medical treatment" was "necessary to [her] health," where her condition had been confirmed by doctors and tests but, after months, she had "not received any of the procedures that [had] been recommended by the physicians as treatment for her condition").
[3] To be clear, while the government's conduct does show deliberate indifference, the court in *Gayle* was wrong to suggest that that is the appropriate standard. The *Gayle* court conflated two distinct points: while establishing deliberate indifference establishes an Eighth Amendment violation and is therefore *sufficient* to establish a less-onerous, Fifth Amendment standard as well, it is not *required* in order to show that less-onerous standard. Here, the professional-judgment standard of *Youngberg* governs Plaintiffs' care. Showing deliberate indifference is more than sufficient to show a *Youngberg* violation, but deliberate indifference is not required.

In addition, "[t]hat it may be inconvenient or more expensive for [Defendants] to run [the facilities] in a constitutional fashion is [not] a defense to this action." *Gates v. Collier*, 501 F.2d 1291, 1322 (5th Cir. 1974).

In short, the evidence shows that COVID-19 poses a serious risk and that Defendants are aware of that risk, both because it is obvious and from explicit notice they have received. Defendants' failure to release Plaintiffs from these intolerable conditions and to cease transferring them between facilities is deliberate indifference to that risk in violation of the Eighth Amendment and therefore necessarily a violation of Plaintiffs' due process rights.

### D.  This Court Has the Authority to Order Plaintiffs' Release.

Courts have broad power to fashion equitable remedies to address constitutional violations in detention facilities. *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978). "When necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population." *Brown v. Plata,* 563 U.S. 493, 511 (2011).[4]

Other courts have specifically highlighted the "especially important" need for "timely release" from ICE detention "now during the COVID-19 pandemic" in light of the possible consequences of "significant exposure to those affected by the virus." *Ali v. DHS*, No. 4:20-CV-0140, 2020 WL 1666074, at *5 (S.D. Tex. Apr. 2, 2020) (highlighting the "especially important" need for "timely release . . . now during the COVID-19 pandemic" from ICE detention for detainees, in light of the possible consequences of "significant exposure to those affected by the virus"). Indeed, "[t]he spread of COVID-19 is measured in a matter of a single day—not weeks, months, or years—and Respondents appear to ignore this condition of confinement that will

---

[4] To remedy a constitutional violation, this Court has the power to release Petitioners' regardless of the statutory basis of their detention. *Pimentel-Estrada v. Barr*, No. 2:20-cv-495, 2020 WL 2092430, at *18 (W.D. Wash. Apr. 28, 2020). This Court retains inherent equitable powers to remedy Due Process Clause violations, regardless of a contrary federal statute. *Id.* (citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15–16 (1971)).

likely cause imminent, life-threatening illness."). *Basank*, 2020 WL 1481503, at \*7 (ordering release of immigrant detainees due to risks posed by COVID-19 in detention facility on due process grounds).Courts across the country have ordered release of immigration detainees on Due Process grounds.[5] And at least one court has ordered ICE to cease transfers between facilities. *Savino II*, 2020 WL 2404923. As these courts have recognized, the Fifth Amendment prohibits civil detention from becoming a death sentence, and courts can properly release them.

This case is distinguishable from *Gomez v. United States*, 899 F.2d 1124 (11th Cir. 1990), where a prisoner with AIDS argued that the Bureau of Prisons could not treat his condition and that he should be released, and the Eleventh Circuit held that "relief of an Eighth Amendment violation does not include release from confinement." *Id.* at 1125-26. "The question is not," the court said, "whether [Mr. Gomez's facility] can provide adequate treatment under court order, but whether the Bureau of Prisons can give adequate medical treatment any place in its system." *Id.* at 1126.

*Gomez* does not prohibit the relief requested here. First, it is not clear that *Gomez* even applies at all. Unlike in *Gomez*, Plaintiffs here are not prisoners. They are not serving a sentence. The interests animating *Gomez* are not present here, which is itself reflected in the fact that the

---

[5] *See, e.g.*, *Medeiros v. Martin*, No. 20-cv-178, 2020 WL 2104897, at \*6 (D.R.I. May 1, 2020); *Pimentel-Estrada*, 2020 WL 2092430; *Ferreyra v. Decker*, No. 20-cv-3170, 2020 WL 1989417, at \*12 (S.D.N.Y. Apr. 27, 2020); *Hernandez v. Kolitwenzew*, No. 2:20-cv-02088, Dkt. 12 (C.D. Ill. Apr. 23, 2020); *Kaur v. DHS*, No. 2:20-cv-3172, 2020 WL 1939386, at \*5 (C.D. Cal. Apr. 22, 2020); *Singh v. Barr*, No. 20-cv-2346, 2020 WL1929366, at \*11 (N.D. Cal. Apr. 20, 2020); *Zaya v. Adducci*, No. 5:20-cv-10921, 2020 WL 1903172, at \*6 (E.D. Mich. Apr. 18, 2020); *Amaya-Cruz v. Adducci*, No. 1:20-cv-789, 2020 WL 1903123, at \*2 (N.D. Ohio Apr. 18, 2020); *Vazquez Barrera v. Wolf*, No. 4:20-cv-1241, 2020 WL 1904497, at \*8 (S.D. Tex. Apr. 17, 2020); *Fofana v. Albence*, No. 20-10869, 2020 WL 1873307, at \*11-12 (E.D. Mich. Apr. 15, 2020); *Ixchop Perez v. Wolf*, No. 19-cv-5191, 2020 WL 1865303, at \*13-14 (N.D. Cal. Apr. 14, 2020); *Doe v. Barr*, No. 3:20-cv-02141, 2020 WL 1820667, at \*11 (N.D. Cal. Apr. 12, 2020); *Hope v. Doll*, No. 1:20-cv-00562, Dkt. 22, at 5 (M.D. Pa. Apr. 10, 2020); *Malam v. Adducci*, No. 2:20-10829, 2020 WL 1809675, at \*5 (E.D. Mich. Apr. 9, 2020); *Basank*, 2020 WL 1481503, at \*7.

standard governing care at the facility (*Youngberg*) is starkly different.[6] However, to the extent that the circumstances of prisoners serving a sentence might be analogous, the instant case "is closer to a challenge to the manner in which the sentence is served and is therefore cognizable under 28 U.S.C. § 2241." *Wilson v. Williams*, No. 4:20-cv-00794, 2020 WL 1940882, at \*6 (N.D. Ohio Apr. 22, 2020); *see also Antonelli v. Warden, U.S.P. Atlanta*, 542 F.3d 1348, 1352 (11th Cir.2008) ("challenges to the execution of a sentence, rather than the validity of the sentence itself, are properly brought under § 2241").

Moreover, *Gomez* concerned whether the BOP could treat a specific serious illness for which treatment was available, and the record in that case reflected "a letter by the BOP's medical director stating that AIDS inmates can be treated adequately in a medical and legal sense in the federal facility at Springfield, Missouri." 899 F.2d at 1126. No such evidence will be forthcoming in this case from ICE because there is no adequate treatment for COVID-19. That is the very point—if Plaintiffs contract it in the first place, they may very well die. There is no facility where ICE can safely house all medically vulnerable detainees threatened by COVID-19. Even if there were, it would violate the CDC guidelines to group them all there. *E.g.*, ECF 1-15 at 67 (recommending medical isolation for confirmed of suspected COVID-19 cases, "(ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others"); *id.* at 78 (for those medically isolated, "Provide medical care to cases inside the medical isolation space"; "Serve meals to cases inside the medical isolation space"; "Assign the isolated individual a dedicated bathroom when possible"). Unlike *Gomez*, here, housing Plaintiffs in immigration detention facilities *is* the harm. There is no empty, single-cell, routinely sanitized ICE facility

---

[6] One court, although ultimately finding that release was not an available remedy, noted the distinctions of the case: "[T]he facts in *Gomez* are not analogous to the instant matter as *Gomez* dealt with a convicted criminal, not civil detainees." *Gayle*, 2020 WL 2086482, at \*7.

waiting for medical vulnerable detainees to arrive, because sending all of the medically vulnerable detainees there would cause the very problem that is the subject of this litigation.

Finally, even assuming *Gomez* explicitly applies here, it contemplates release in certain circumstances. As one court notes, *Gomez*'s explanation of its holding "strongly implies that had no facility been able to treat *Gomez* as constitutionally required, he may have been entitled to habeas relief." *Swain v. Junior*, No. 1:20-cv-21457-KMW, 2020 WL 2078580, at *20 (S.D. Fla. Apr. 29, 2020); *see also Gayle v. Meade*, No. 20-cv-21553, 2020 WL 1949737, at *26 (S.D. Fla. Apr. 22, 2020) (Goodman, M.J.) ("[T]he *Gomez* rule is based on the implicit assumption that a 'correction' or 'discontinuance' of the unconstitutional practice is actually *available.* If no correction is feasible, then the remedy which the Eleventh Circuit relied upon would become illusory. If that were the case, then the Undersigned would reconsider the conclusion that there is no habeas corpus release remedy for the detainees at the three South Florida detention centers."). As indicated above, there is no empty ICE facility waiting to accept thousands of medically vulnerable detainees, and constitutional conditions of detention are not otherwise available.

This Court has the power to take note of the markedly dissimilar circumstances of Plaintiffs' civil detention and order the only relief that will alleviate the violation: release. The Court also has the power to bar transfers that violate Plaintiffs' constitutional rights. *See Louis v. Meissner*, 530 F. Supp. 924, 927 (S.D. Fla. 1981).

## II.   Infection with a Lethal Virus that Lacks Any Vaccine or Cure Constitutes Irreparable Harm.

For Plaintiffs, the difference of just a few days—or the imposition of just one additional transfer—may be the difference between life and death. There is a "substantial likelihood" that absent immediate relief from this Court, Plaintiffs will be infected with COVID-19, either due to the unsanitary and crowded realities of Glades, Baker, and Krome or during an equally crowded

22

and dirty transfer to an equally risky or even more dangerous detention facility. And, due to their medical vulnerability, Plaintiffs face a heightened risk of dying or suffering long-term health consequences from this infection, which "cannot be undone through monetary remedies." *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir. 1981) (alteration and quotation omitted). Plaintiffs' continued detention and the possibility of transfer thus both pose a "substantial threat of irreparable harm or injury" to their health and safety. *Global Tel*Link Corp. v. Scott*, 652 F. Supp. 2d 1240, 1247 (M.D. Fla. 2009).[7]

Furthermore, these threats of imminent harm warrant immediate relief. Plaintiffs need not contract COVID-19 or experience serious complications first. "It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *McKinney*, 509 U.S. at 33. Just as "a prison inmate . . . [can] successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery," Plaintiffs can seek release before being ravaged by COVID-19 attack, *see id.*; *see also Chandler*, 379 F.3d at 1289 (recognizing that an "inmate 'need not await a tragic event' before seeking relief . . . [if he] at the very least show[s] that a condition of his confinement 'pose[s] an unreasonable risk of serious damage to his future health' or safety" (quoting *McKinney*, 509 U.S. at 33, 35)); *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1307 (M.D. Fla. 2010) (holding that institutionalization that "Plaintiff's physician [had] indicated . . . [would be] detrimental to Plaintiff's health and well-being" could "constitute irreparable harm").

---

[7] *See also Morton*, 671 F. Supp. 2d at 1313-14 (finding that delaying surgery for "a serious medical condition" constituted irreparable harm); *Cabral v. Olsten Corp.*, 843 F. Supp. 701, 704 (M.D. Fla. 1994) ("the threat of termination of medical benefits constitutes irreparable harm"); *Robinson v. Marshall*, --- F. Supp. 3d ---, 2020 WL 1847128 at *8, *15 (M.D. Ala. 2020) (citing "an increase in medical risk" as evidence of irreparable harm), *aff'd sub nom. Robinson v. Attorney General*, No. 20-11401, 2020 WL 1952370 (11th Cir. Apr. 23, 2020).

For these reasons, judges across the country have found that increased risk of infection with COVID-19 at or via transfer to an immigration detention center constitutes irreparable harm warranting a temporary restraining order. *See, e.g.*, *Basank*, 2020 WL 1481503, at *4 ("The risk that Petitioners will face a severe, and quite possibly fatal, infection if they remain in immigration detention constitutes irreparable harm warranting a TRO."); *Savino*, 2020 WL 2404923, at *6 (same for risks from transfer).

### III.    There is a Strong Public Interest in and the Balance of the Equities Favors Plaintiffs' Release.

The public interest strongly favors Plaintiffs' release and an order barring Defendants from transferring Plaintiffs to other facilities. First, and fundamentally, the "public interest does not support [Defendants'] expenditure of time, money, and effort in" detaining or transferring Plaintiffs in circumstances that are likely to be held unconstitutional. *Fla. Businessmen for Free Enterprise v. City of Hollywood*, 648 F.2d 956, 959 (11th Cir. 1981).

Moreover, release and stopping any transfers is necessary not only to save Plaintiffs from imminent risk, but also to protect public health in the community at large. The disease is highly contagious and has no vaccine or cure; each new infection is likely to result in many more individuals getting sick. *See* Amon Decl. ¶¶ 19-25; Graves Decl. ¶ 9. The release of people most vulnerable to COVID-19 reduces the overall risk for everyone: detainees, facility staff, and the broader community. *See* Amon Decl. ¶¶ 49, 51; Graves Decl. ¶ 13. Equally, it is the best way to avoid the additional burdens that would be imposed on the healthcare system if Plaintiffs were to become seriously ill. Detention facilities, including Glades, Baker, and Krome, often rely on outside hospitals and emergency departments to provide intensive medical care. Amon Decl. ¶ 47. Plaintiffs' release thus *furthers* the public's—and Defendants'—interest in slowing the spread of COVID-19 at immigration detention facilities. The same is true of barring any

24

transfers. *See Savino*, 2020 WL 2404923, at *10 (holding that "the public has a powerful interest in ensuring that there is not an outbreak within . . . detention center[s] that is then primed to spread via the staff to the wider community"). "Were the government to loose an uncontainable viral outbreak from within its detention centers, it would betray its duty to the public, not just to the detainees." *Id.* at *11.

If released, Plaintiffs would return to live with their families and loved ones, or in their own apartments. St. Louis Decl. ¶ 21; Arrendondo Decl. ¶ 21; Bucknor Decl. ¶ 21; Dorival Decl. ¶ 26; Montaque Decl. ¶ 16; Robinson Decl. ¶ 16; Wilson Decl. ¶ 17. In similar circumstances, other courts have ordered release with self-quarantine for the recommended 14-day period.

Finally, the balance of equities heavily favors Plaintiffs' release and against any transfers, in light of the serious illness or death they risk from COVID-19. Compared with Plaintiff's substantial risk of irreparable harm, any harm to any interest Defendants might retain in continuing to detain or transfer Plaintiffs is slight. *See Hispanic Interest Coalition of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1249 (11th Cir. 2012) (holding that the equities favored an injunction against a state law, where the state of "Alabama [had] no interest in enforcing a state law that [was] unconstitutional, and the interference with the educational rights of undocumented children [was] not a harm that [could] be compensated by monetary damages"); *see also supra* Argument I.A (these life-threatening conditions serve no legitimate governmental goal).

## CONCLUSION

This Court should grant Plaintiffs' motion for a temporary restraining order and direct Plaintiffs' immediate release. Additionally, this Court should order that Plaintiffs shall not be transferred to another detention facility unless required by another judicial proceeding.

Dated: May 19, 2020                               Respectfully Submitted,

                                                  /s/ Amien Kacou

David C. Fathi**                                  Amien Kacou, Fla. Bar No. 44302
Eunice H. Cho**                                   Daniel Tilley, Fla. Bar No. 102882
Joseph Longley***                                 AMERICAN CIVIL LIBERTIES UNION
AMERICAN CIVIL LIBERTIES UNION                       FOUNDATION OF FLORIDA
   FOUNDATION, NATIONAL PRISON                     4343 West Flagler Street, Suite 400
   PROJECT                                         Miami, FL 33134
915 15th St. N.W., 7th Floor                      (786) 363-2714
Washington, DC 20005                              akacou@aclufl.org
202-548-6616                                      dtilley@aclufl.org
dfathi@aclu.org
echo@aclu.org                                     Vera Eidelman*
jlongley@aclu.org                                 Rebecca Ojserkis*
                                                  AMERICAN CIVIL LIBERTIES UNION
                                                     FOUNDATION
Michael Tan*                                      125 Broad Street, 18th Floor
Omar C. Jadwat*                                   New York, NY 10004
AMERICAN CIVIL LIBERTIES UNION                    (212) 549-2600
   FOUNDATION, IMMIGRANTS'                        veidelman@aclu.org
   RIGHTS PROJECT                                 rojserkis@aclu.org
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2600
mtan@aclu.org
ojadwat@aclu.org

* Admitted pro hac vice.
** Admitted pro hac vice; not admitted in DC; practice limited to federal court.
*** Motion to appear pro hac vice forthcoming; not admitted in DC; practice limited to federal court.

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing motion via the Court's ECF filing system and via email courtesy copy to the office of the United States Attorney for the Middle District of Florida.

Dated: May 19, 2020                               /s/ Amien Kacou
                                                  Amien Kacou