UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

HERAUD ST. LOUIS; LUIS MACIAS
ARREDONDO; THEOPHILUS BUCKNOR;
WILKENS DORIVAL; MARK ANTHONY
MONTAQUE; LENNOX ROBINSON; and
ROMAINE ODEAN WILSON,

Case No.:   2:20-cr-349-FtM-60NPM

Petitioners-Plaintiffs,

v.

JIM MARTIN, in his official capacity as Field Office
Director, Enforcement and Removal Operations,
Miami Field Office, U.S. Immigration and Customs
Enforcement; CHAD WOLF, in his official capacity
as Acting Secretary, U.S. Department of Homeland
Security; MATTHEW ALBENCE, in his official
capacity as Deputy Director and Senior Official
Performing the Duties of the Director, U.S.
Immigration and Customs Enforcement; U.S.
IMMIGRATION AND CUSTOMS
ENFORCEMENT; DAVID HARDIN, in his official
capacity as Sheriff of Glades County, Florida; and
SCOTTY RHODEN, in his official capacity as
Sheriff of Baker County, Florida,

Respondents-Defendants.
_____/

## OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER

Pursuant to the Court's May 20, 2020 Order (Doc. 18), the Respondents file this

opposition to Petitioners' Motion for a Temporary Restraining Order.

### I.        Introduction

Petitioners, civil detainees who are currently held at the Baker County Jail ("BCJ"),

Glades County Detention Facility ("Glades"), and Krome Service Processing Center

("Krome"), have filed a motion seeking a temporary restraining order that prohibits their transfer and orders immediate release from custody.   As explained below, Petitioners' motion should be denied because the Court cannot grant release from custody in a case that challenges the conditions of confinement.   Further, the motion should be denied because Petitioners cannot meet the substantial burden necessary to merit preliminary injunctive relief.

## II.      Factual Background

### A.  Petitioners' Criminal and Immigration Histories

#### 1.  Bucknor's Criminal and Immigration History

Petitioner Theophilus Bucknor is a native and citizen of Nigeria.   Exhibit 1, Declaration of AFOD Smith, ¶ 26.   On February 3, 2014, he was issued a Notice to Appear (NTA) charging him as removable under section 237(a)(2)(E)(i) of the Immigration and Nationality Act (INA), as an alien who at any time after admission had been convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment. *Id.*, ¶ 27.   On November 20, 2014, the Immigration Judge sustained the charge of removability as stated on the NTA.   *Id.*   On November 16, 2017, the Immigration Judge denied all applications for relief, and ordered Petitioner removed from the United States. *Id.*   On November 21, 2018, the Board of Immigration Appeals dismissed Petitioner's appeal, and Petitioner's removal order became final.   *Id.*   Petitioner is detained in BCJ pursuant to 8 U.S.C. § 1231(a)(2).   Petitioner is currently being processed for removal, and ERO has a pending request for a travel document

### 2.  Dorival's Criminal and Immigration History

Petitioner, Wilkens Dorival, is a native and citizen of Haiti, who was admitted into the United States as a Lawful Permanent Resident on or about March 15, 2000.  *See* Ex. 1, ¶ 29. Since entering the United States, Petitioner has been convicted several times for various offenses.  *Id.*, ¶¶ 30-36.  On May 16, 2019, Petitioner was most recently convicted for the offenses of Battery on a Law Enforcement Officer, Possession of Three Grams or Less of Synthetic Cannabis, and Possession of Drug Paraphernalia, in violation of sections 784.07(2)(B), 893.13(6)(B) and 893.147(1) of the Florida Statutes.  *Id.*, ¶ 35.  Dorival was sentenced to fifteen months of incarceration.  *Id.*  Petitioner was issued a Notice to Appear, and was ultimately charged as removable under sections 237(a)(2)(A)(ii), 237(a)(2)(B)(i), and 237(a)(2)(A)(iii) of the Immigration and Nationality Act (INA).  *See id.*, ¶ 37.  On August 26, 2019, an Immigration Judge sustained the three charges of removability.  *Id.*, ¶ 38.  Petitioner is currently in removal proceedings, and has an upcoming hearing with the Immigration Judge on June 5, 2020 at Krome.  *Id.*  Petitioner was transferred to Baker County Detention Center on or about April 29, 2020.  *Id.*, ¶ 39.  Due to his criminal convictions, Petitioner was detained under the authority of 8 U.S.C. § 1226(c).  Due to the need to decrease the overall detainee population, and Petitioner's upcoming hearing with the Immigration Judge at Krome, he was transferred out of BCJ on May 15, 2020. *Id.*, ¶ 40.  Petitioner is currently detained at Krome.

### 3.   St. Louis's Criminal and Immigration History

Petitioner St. Louis is a native of the Bahamas and a citizen of Haiti.  On February 1, 2019, DHS served Petitioner with a Notice to Appear, charging him with removability pursuant to Section 237(a)(2)(B)(i) as being removable based upon a conviction for a controlled substance violation. Exhibit 2, Declaration of AFOD Castano, ¶ 23.   Petitioner appeared before an immigration judge, who sustained the charge, denied his applications for relief from removal, and ordered Petitioner removed from the country.  *Id.*  Petitioner's appeal before the Board of Immigration Appeals, is currently pending.  *Id.*

On May 20, 2020, Petitioner was released from Glades County Detention Center and transferred to the custody of Lee County Sheriff's Office, based upon an outstanding warrant issued by the State of Florida, for failing to abide by the conditions of his probation, to include the submission of a tampered urine specimen for his court-ordered drug testing.   Consequently, Petitioner is no longer in ICE custody. *Id.*, ¶ 26.

### 4.   Macias' Criminal and Immigration History

Petitioner Macias-Arredondo, is a native and citizen of Colombia, who was paroled into the United States in 2018.  *Id.*, ¶ 36.  Petitioner was processed for Expedited Removal under 8 U.S.C. § 1225(b)(1) and detained by ICE on February 11, 2020.  *Id.*   Following an interview, DHS officials issued a Notice to Appear, charging Petitioner as an arriving alien pursuant to Section 8 U.S.C. § 1182(a)(7)(A)(i)(I), as an intending immigrant without a proper admission document. *Id.*

Macias was transferred to the Glades County Detention Center on February 14, 2014.  *Id.*, ¶ 37.   His removal proceedings are pending, and a merits hearing is scheduled on Macias' applications for relief from removal on June 8, 2020.

5. **Montaque's Criminal and Immigration History**

Petitioner Montaque is a native and citizen of Jamaica, who was admitted to the United States in 2006 as a conditional resident.  *Id.*, ¶ 33.   On February 3, 2020, DHS served Petitioner with a Notice to Appear, charging Petitioner with removability pursuant to Section 237(a)(2)(E) of the Immigration and Nationality Act, as amended, based upon his prior conviction for a crime of child abuse, neglect or abandonment.  *Id.*   Petitioner has been detained by ICE at Glades since February 4, 2020.  *Id.*   On May 6, 2020, Petitioner appeared with the FIU Law Clinic, which requested a continuance for review of the Notice to Appear and to prepare the case, and the matter was reset to June 8, 2020.  *Id.*

6. **Robinson's Criminal and Immigration History**

Petitioner Robinson is a native and citizen of Jamaica, who was admitted to the United States in 2009 as a lawful permanent resident.  *Id.*, ¶ 30.   In July 2019, he was convicted in Broward County, FL of Carrying a Concealed Firearm, for which he received an 11 month term of probation.  *Id.*   DHS charged Petitioner with removability pursuant to Section 237(a)(2)(C), based upon his conviction at any time after admission for a firearms offense.   On January 22, 2020, an immigration judge determined that Petitioner is ineligible for a custody redetermination, inasmuch as his criminal conviction renders him subject to mandatory detention pursuant to Section 236(c) of the Immigration and Nationality Act.

*Id.*  Petitioner is next scheduled to appear before an immigration judge for a hearing on the merits of his applications for relief from removal on July 1, 2020.   *Id.*

### 7.  Wilson's Criminal and Immigration History

Petitioner Wilson is a native and citizen of Jamaica who was admitted to the United States in 2012. *Id.*, ¶ 27.   In October, 2019, DHS officials served Petitioner with a Notice to Appear, charging him with removability pursuant to Section 237(a)(2)(A)(ii) for his convictions for two or more crimes involving moral turpitude not arising out of a single scheme of criminal misconduct.   *Id.*   On April 20, 2020, an immigration judge sustained the charge, and denied Wilson's applications for relief from removal.   *Id.*   Petitioner did not appeal his case, and it is now administratively final.

### B.  Respondents efforts to combat risks associated with COVID-19[1]

### 1.  BCJ's COVID-19 Protocols

Upon arrival at BCJ, each detainee undergoes a medical screening.   Exhibit 1, Declaration of AFOD Smith, ¶ 10.   During the screening process, detainees are assessed for fever and respiratory illnesses and asked questions to determine whether they have had symptoms of COVID-19 or been in circumstances where they may have contracted COVID-19.  *Id.*

Detainees who present at BCJ with symptoms consistent with COVID-19 are placed in isolation in one of four medical cells and tested. *Id.*, ¶ 11.   If testing is positive, the

---

1 Glades, Krome, and BCJ both follow the *ERO COVID-19 Pandemic Response Requirements* (PRR) and the CDC's *Interim Guidance on Management of Coronavirus 2019 (COVID-19) in Correctional and Detention Facilities*.   *See* Ex. 1, ¶¶ 6-8; Ex. 2, ¶¶ 5-7.

detainee will remain isolated and treated.  *Id.*  In case of any clinical deterioration, a detainee will be referred to the Ed Fraser Memorial Hospital in MacClenny, Florida for immediate care until bed space can be secured at the University of Florida Shand's Hospital in Gainesville, Florida, or the Jacksonville Memorial Hospital in Jacksonville, Florida.  *Id.*

Detainees who do not present with symptoms but have been exposed to a person with a confirmed case of COVID-19 are placed in cohorts with restricted movement for the duration of the most recent incubation period (fourteen days after most recent exposure) and are monitored daily for fever and symptoms of respiratory illness.  *Id.*, ¶ 12.  At BCJ, detainees are placed in cohorts if they were all simultaneously exposed to a person who has tested positive for COVID-19 or if a group of detainees all arrived at BCJ at the same time and were all exposed simultaneously to a person who tested positive for COVID-19.  *Id.*  If a group of less than four detainees need to be cohorted, they are separated into pairs and isolated in a single cell for a period of fourteen-days under observation.  *Id.*  If a larger group requires cohorting, the detainees will be isolated in a dormitory and will not have contact with the rest of the detainee population for the fourteen-day period.  *Id.*  Cohorted detainees who do not develop symptoms after the fourteen-day period are cleared and released into the general detainee population.  *Id.*  While a detainee is cohorted, confinement rounds are completed daily in order to allow detainees time to voice their concerns directly to medical staff.  *Id.*

Additionally, since approximately April 15, 2020, BCJ has started cohorting all new detainees in dormitories designed for this function.  *Id.*  The detainees that are cohorted

under this new measure are not suspected of COVID-19, nor suspected of being in contact

with an individual who has tested positive for COVID-19.   *Id.*   BCJ initiated this

precautionary measure as an added safeguard to prevent infection in the detainee population.

*Id.*   Detainees that have been cohorted since April 15th are subject to a fourteen-day

observation period, and are not allowed into the general population until the end of the

observation period.   *Id.*   Detainees are only allowed to join the rest of the population if they

are asymptomatic and show no signs of a rise in body temperature.   *Id.*

In addition to these intake and cohorting procedures, BCJ has taken steps to decrease

the population of detainees.   As of May 21, 2020, BCJ is at 68% capacity for ICE detainees.

*Id.*, ¶ 15.   At present, none of BCJ's dormitories are filled to capacity.   Further, BCJ has

also taken steps to implement social distancing.   Staff at BCJ have allowed smaller groups

into recreation areas and the law library.   *Id.*, ¶ 17.   Chairs in the medical lobby have been

rearranged, and detainee movement has been limited as much as possible.   *Id.*   Additionally,

BCJ has suspended social visits, all gatherings and tours, and travel for dental and optometry

appointments.   *Id.,* ¶ 18.

BCJ has also taken steps to increase sanitation.   Prior to the COVID-19 pandemic,

cleaning supplies were provided to detainees once a day.   *Id.*, ¶ 16.   Since, each dormitory

unit is provided with cleaning supplies twice per day.   *Id.*   These supplies include Virex II

256, Stride Citrus HC, Glance HC, and Crew NA non-acid bowl and bath cleaners.   *Id.*

Additionally, common areas are cleaned throughout the day by inmate workers.   *Id.*

BCJ has also issued all detainees masks.   *Id.*, ¶ 16.   These masks are exchanged weekly and can be replaced upon request if they become soiled or unusable.   *Id.*

As of May 20, 2020, there are no suspected or confirmed cases of COVID-19 among detainees or staff.   *Id.*, ¶ 14.   No detainees are being cohorted due to contact with a person who has a confirmed case of COVID-19.   *Id.*

2. **Glades' COVID-19 Protocols**

Every detainee who arrives at Glades County Detention Center ("Glades") undergoes a medical screening.   Exhibit 2, Declaration of AFOD Castano, ¶ 9.   During the screening process, detainees are assessed for fever and respiratory illnesses and asked questions to determine whether they have had symptoms of COVID-19 or been in circumstances where they may have contracted COVID-19.   *Id.*

Detainees who present to Glades with symptoms compatible with COVID-19 are immediately transported off-site to the nearest testing center or Emergency Room hospital for further evaluation and testing.   *Id.*, ¶ 10.   Detainees who test positive remain isolated and treated.   *Id.*   If the detainee returns to the facility with a positive diagnosis, he/she is kept quarantined until he/she is no longer infectious.   *Id.*   During this time, health care providers will monitor vital signs, pulse oximetry, input/output, auscultate lungs, and document findings in the medical record.   *Id.*   If the patient demonstrates any signs of worsening, the patient will be referred to a local hospital.   *Id.*

Detainees who do not present with symptoms but have been exposed to a person with a confirmed case of COVID-19 are placed in cohorts with restricted movement for the

duration of the most recent incubation period (fourteen days after most recent exposure) and are monitored daily for fever and symptoms of respiratory illness.   *Id.*, ¶ 11.[2]   At Glades, this is accomplished by quarantining detainees who may have been exposed in their housing unit for 14 days.   *Id.*   During that time, no one is added to the housing unit and individuals in the cohorted unit are prohibited from coming into contact with individuals from other housing units.   *Id.*

In addition to these intake and cohorting procedures, Glades has taken steps to decrease the population of detainees.   As of May 21, 2020, Glades is at 75% capacity.   *Id.*, ¶ 14.   Further, every detainee at Glades is issued a mask that can be exchanged every Friday. *Id.*, ¶15.   Glades also provides adequate amounts of soap, water and cleaning materials at no cost. *Id.*, ¶ 15.   Detainees are provided personal hygiene items, including soap, which is replenished on request.   *Id.*   Detainees are also given 4 oz. allotments of antibacterial soap, which is also replenished as needed.   *Id.*   Additionally, every dormitory unit has antibacterial soap dispensers, running water, and paper towels, all of which are replenished as needed.   *Id.*   Regimented cleaning details are deployed throughout the facility on a continual basis to disinfect frequently touched surfaces in all common areas, and all dormitories are sanitized twice daily.   *Id.*

Glades has suspended in-person social visits and facility tours.   *Id.*, ¶ 16.   All personnel, including County officers, ICE staff, medical staff, transport officers, administrative personnel, and attorneys, are screened upon entering Glades.   *Id.*, ¶ 17.

---

2 Krome, like Glades and BCJ, cohorts detainees in accordance with ICE and CDC guidelines.

Further, all staff, contractors, and private attorneys are required to wear personal protective equipment while in Glades.   *Id.*, ¶¶ 18-19.

As of May 21, 2020, there has been one confirmed case of COVID-19 at Glades.   *Id.*, ¶ 13.   The infected individual, a Sheriff's Deputy, is no longer on the schedule and is self-quarantining.   *Id.*   As a precautionary measure, 346 detainees are being cohorted.   *Id.* They are medically assessed twice per day.   *Id.*

## II.   Argument[3]

### A.  Release from confinement is not available relief in this action

Petitioners claim that the conditions of their confinement violate their substantive due process rights under the Fifth Amendment of the United States Constitution.   *See* Petition, ¶¶ 181-83.   Based on those alleged violations, Petitioners ask the Court to order their immediate release.   *See* Doc. 17 at 25.   Because Eleventh Circuit precedent precludes the Court from ordering Petitioners released from custody, the Motion for a TRO should be denied insofar as it seeks Petitioner's immediate release.[4]

In the Eleventh Circuit, "release from imprisonment is not an available remedy for a conditions-of-confinement claim."   *Vaz v. Skinner*, 634 F. App'x 778, 781 (11th Cir. 2015 (per curiam).   Indeed, if a court finds that conditions of confinement violate a prisoner's

---

3  As an initial matter, any claims brought by St. Louis should be denied and dismissed as moot.   On May 20, 2020, St. Louis was transferred into the custody of the Lee County Sheriff's Office based on an outstanding warrant.   See, Ex. 2, ¶ 26.   Since he is no longer subject to the conditions complained of in the Motion, the court cannot grant him meaningful relief.   As such, all claims raised in the Motion are moot as to St. Louis. *See Al Najjar v. Ashcroft,* 273 F.3d 1330, 1335-36 (11th Cir. 2001) ("[A] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief.").
4  Petitioner's Motion also requests that the Court issue an injunction preventing ICE from transferring Petitioners to different facilities.

constitutional rights, "[t]he appropriate Eleventh Circuit relief . . . is to require the discontinuance of any improper practices, or to require correction of any condition causing cruel and unusual punishment." *Gomez v. United States*, 899 F.2d 1124, 1126-27 (11th Cir. 1990).

Petitioners try to distinguish themselves from the petitioner in *Gomez* by pointing out that they are not prisoners. Further, they argue that an exception to *Gomez* exists in situations where unconstitutional conditions of confinement cannot be corrected. *See* Motion for TRO at 20-21. However, the mere fact that Petitioners are not prisoners makes no difference because the Eleventh Circuit has already indicated that its holding from *Gomez* applies to civil detainees in ICE custody, *see Vaz*, 634 F. App'x at 781-82 (noting that a detained alien could not obtain release based on his conditions of confinement claim). And the exception to *Gomez* that Petitioners press has no support in the law. Indeed, Petitioners do not cite to any case law substantiating their plea for an exception. Further, at least one court in this Circuit has rejected the very exception argued by Petitioners. *See Matos v. Lopez Vega*, 2020 WL 2298775, at *10-11 (S.D. Fla. May 6, 2020) (rejecting petitioners request to grant an exception to *Gomez* based on the assertion that release was the only available remedy).

Accordingly, even if Petitioners can establish that they are entitled to a TRO, they cannot be granted immediate release. As such, Petitioners' motion for a TRO should be denied to the extent it seeks relief the court lacks authority to grant.

**B.   The Court should deny Petitioner's Request for a TRO**

**1. Legal Standard for a TRO**

In the Eleventh Circuit, the standard for obtaining a TRO is the same as the standard

for obtaining a preliminary injunction.   *See Parker v. State Bd. of Pardons and Paroles*, 275

F.3d 1032 (11th Cir. 2001).   In either case, injunctive relief is only appropriate when the

moving party can show that "(1) he is substantially likely to succeed on the merits; (2) he

will suffer irreparable injury unless the injunction issues; (3) the threatened injury to the

movant outweighs whatever damage the proposed injunction may cause the opposing party;

and (4) the injunction would not be adverse to the public interest." *Windsor v. United

States*, 379 F. App'x 912, 915 (11th Cir. 2010) (internal quotation marks omitted).   Because

a preliminary injunction is an "extraordinary and drastic remedy," Eleventh Circuit law

requires the moving party to bear the burden of persuasion and "clearly establish" all four

elements.   *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016).

Additionally, a party seeking an injunction that forces another party to act carries an

increased burden.   Generally, temporary restraining orders and preliminary injunctions

merely preserve the status quo between parties.   *See Fernandez-Roque v. Smith*, 671 F.2d

426, 429 (11th Cir. 1982).   But, "[w]hen a preliminary injunction is sought to force another

party to act, rather than simply to maintain the status quo, it becomes a 'mandatory or

affirmative injunction.'" *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1295 (M.D. Fla. 2010).

Mandatory injunctions are "particularly disfavored" by the courts because one "goes well

beyond simply maintaining the status quo." *Antoine on behalf of I.A v. School Bd. of Collier*

*Cnty.*, 201 F. Supp. 3d 1195, 1203 (M.D. Fla. 2018).   As such, requests for a mandatory injunction are held to a higher standard and should only be granted if "the facts and law clearly favor the moving party."   *Id.*

Because Petitioners' seek, in part, a change of the status quo—*i.e.*, their immediate release—their request for a TRO should be held to the higher standard and only be granted if the facts and law are clearly in their favor.   *See Antoine*, 201 F. Supp. 3d at 1203.

### 2.   Petitioners' Constitutional Claims are unlikely to succeed on the merits

Petitioners have offered three separate theories for their substantive due process claims.   First, they argue that the conditions of confinement and transfer are impermissible punishment not related to a legitimate government interest.[5]   Doc. 17 at 11.   Second, they argue that the conditions of confinement and transfer do not reflect the exercise of professional judgment.   Third, Petitioners argue that the conditions of confinement and transfer violate their substantive due process rights because they show ICE has acted with deliberate indifference.   The government will address each theory in turn.[6]

### a.   Petitioners' detention furthers legitimate government interests

Petitioners have not clearly established that the conditions of confinement or transfer amount to punishment.   "Due process requires that a pretrial detainee not be punished prior to a lawful conviction."   *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004).   "To

---

5 Petitioners' complaints about transfer are based on the same conditions as the complaints about detention generally—i.e., lack of social distancing and sanitation.   As such, the government addresses them jointly.
6 Other than pointing out the existence of confirmed cases, Petitioners do not make any specific claims about the conditions of confinement at Krome.   Without facts in support, Petitioners' claims as to Krome cannot clearly establish that they are entitled to preliminary injunctive relief.   *See Wreal, LLC*, 840 F.3d at 1247.

determine whether a condition of pretrial detention amounts to punishment, [a court] must decide whether the condition is imposed for the purpose of punishment or whether it is incident to some legitimate governmental purpose." *McMillian v. Johnson*, 88 F.3d 1554, 1564 (11th Cir. 1996).   Where a condition is not reasonably related to a legitimate goal—that is, where the condition is arbitrary or purposeless—courts may infer that the purpose of government action is punishment.  *See Magluta*, 375 F.3d at 1273.

Petitioners claim that their confinement puts them in "close proximity to other detainees" without sufficient hygiene or sanitation.   Doc. 17 at 12.   Petitioners argue that these conditions serve no legitimate purpose and are not reasonably related to the enforcement of immigration laws.   Based on these assertions, Petitioners invite the Court to infer that the purpose behind their detention is punishment.   Petitioners are wrong on two fronts.

First, Petitioners' detention—and any conditions incident to that detention—serves a legitimate purpose.   Indeed, in the immigration context, the Supreme Court has consistently upheld the constitutionality of detention, citing the Government's legitimate interest in protecting the public and preventing aliens from absconding and failing to appear for their removal proceedings. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) (noting that detention during immigration proceedings prevents the risk that alien will abscond or engage in criminal activity); *Demore v. Kim,* 538 U.S. 510, 520-23 (2003) (recognizing that detention during immigration proceedings serves the government's interest in completing deportation proceedings); *Zadvydas*, 533 U.S. 678, 690-91 (2001).   Here, Petitioners do not

claim there is no basis for detainment.   As such, their confinement furthers the government's interest in protecting the public and avoiding the risk of flight.

Second, the factual record indicates that ICE has taken steps to protect Petitioners from risks associated with COVID-19.   *See supra* Section II.B.   These affirmative steps, which were taken to ensure the health and safety of those in ICE custody, belie the notion that the purpose behind Petitioners' detention is punishment.   Instead, they show that BCJ and Glades have attempted to balance their interests in detainment against Petitioners' interests in avoiding exposure to COVID-19.

Further, courts in this circuit have found that, despite the COVID-19 pandemic, continued detention "is reasonably related to [the government's] legitimate purpose." *Matos*, 2020 WL 2298775, at *10-11.   In *Matos*, a court was asked to consider whether the conditions of confinement at Broward Transitional Center constituted punishment in violation of the substantive due process rights of immigration detainees.   *Id.* at * 5.   The *Matos* court recognized that detention is inherently flawed and creates a "risk that detainees will be exposed to certain communicable diseases." *Id.* at *10.   Notwithstanding that recognition, the Court noted that "these shortcomings do not automatically translate into a constitutional violation." *Id.* at *10.   Ultimately, the court held that the conditions at Broward Transitional Center did not amount to punishment.   *Id.*   That decision was based, in part, on the fact that "Respondents have made conscious efforts to create a safe environment for the detainees and BTC's staff, despite inherent obstacles and the novel COVID-19 virus." *Id.*

As explained above, detention serves the legitimate government interest in ensuring public safety and the smooth completion of removal proceedings.   *See Jennings*, 138 S. Ct. at 836; *Demore v. Kim,* 538 U.S. at 520-23; *Zadvydas*, 533 U.S. at 690-91.   Despite the COVID-19 virus, those interests continue to be served by detention, particularly where the government has taken steps to create a safe environment.   *See Matos*, 2020 WL 2298775, at *10-11.   Because Glades and Baker have taken such steps here, Petitioners are unlikely to succeed on their claim that their continued detention amounts to punishment in violation of their substantive due process rights.

### b.  The *Youngberg* professional judgment standard does not apply

In their second theory of liability, Petitioners argue that their conditions of confinement and transfer violate their substantive due process rights under the professional judgment standard articulated by the Supreme Court in *Youngberg v. Romeo*, 457 U.S. 307 (1982).   Petitioners are unlikely to succeed on this theory because the *Youngberg* standard does not apply in the immigration context.

Petitioners do not offer any substantive discussion of the applicability of *Youngberg*. Instead, they cite to a single decision from this district and a footnote from an Eleventh Circuit opinion and assume that *Youngberg* applies to any challenge to the conditions of confinement brought by civil detainees.   Doc. 17 at 13.   In doing so, Petitioners overstate the reach of *Youngberg*.

The *Youngberg* standard applies in narrow situations where a person who has been involuntarily committed challenges the medical care he receives or the conditions of his

17

confinement.   In *Youngberg*, the plaintiff was a 33 year-old with the mental capacity of an 18-month-old child who was involuntarily committed pursuant to the Pennsylvania Mental Health and Mental Retardation Act.   457 U.S. 307, 309-10.   To determine whether the plaintiff's due process rights were violated by his conditions of confinement, the Supreme Court sought to balance plaintiff's liberty interests against the interests of the state.   *Id.* at 321.   To analyze those competing interests, the Supreme Court used the professional judgment standard put forth here by Petitioners.   *See id.* at 321-22.   According to the *Youngberg* court, that was "the proper standard for determining whether a State adequately has protected the rights of the involuntarily committed mentally retarded."   *Id.* at 321.

The narrow applicability of the *Youngberg* standard has been recognized by at least one court in this district: "*Youngberg* undertakes to clarify the constitutional standard applicable to a 'profoundly retarded,' permanently civilly committed, and intermittently violent adult who was incapable of maintaining himself or defending himself against himself or others."   *Hughes v. Judd*, 108 F. Supp.3d 1167, 1180 (M.D. Fla. 2015).   The cases cited by Petitioners do not suggest broader application would be appropriate.   Indeed, both cases deal with due process claims brought by persons who had been civilly committed to the Florida Civil Commitment Center.   *See Hood v. Dep't of Children and Families*, 200 F. App'x 988, 989 (11th Cir. 2017); *Corups v. Lamour*, 2018 WL 5221241, at *1 (M.D. Fla. 2018).

Since the *Youngberg* standard does not apply in the immigration context, Petitioners are unlikely to succeed on this claim.

18

### c. Petitioners continued detention does not constitute deliberate indifference

In their third theory of liability, Petitioners argue that Respondents have violated their substantive due process rights by being deliberately indifferent to an unreasonable risk. Doc. 17 at 15. As with their other theories, Plaintiffs are unlikely to succeed under a deliberate indifference analysis.

The Eleventh Circuit has held that "in regard to providing pretrial detainees with such basic necessities as food, living space, and medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." *Hamm v. DeKalb Cty.*, 774 F.2d 1567, 1574 (11th Cir. 1985). Thus, although Petitioners are pretrial detainees whose rights arise under the Fifth Amendment, their conditions of confinement claim can be analyzed under the standard for assessing Eighth Amendment violations. *See Swain v. Junior*, 2020 WL 2161317, at * 4 (11th Cir. May 5, 2020).

"An Eighth Amendment challenge to the conditions of confinement has two components: one objective and the other subjective." *Id.* Under the objective component, a petitioner must show that they suffered "an objectively intolerable risk of harm." *Id.* That is, a petitioner must show that the conditions being challenged "were extreme and presented an unreasonable risk of serious damage to his future health or safety." *Id.* (internal quotation marks omitted).

Under the subjective component, petitioners must show that prison officials acted with deliberate indifference. *Id.* Prison officials act with deliberate indifference where they

19

"know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* To establish deliberate indifference, petitioners must show that prison officials acted with a state of mind similar to that of criminal recklessness. *Id.* Accordingly, prison officials who respond reasonably may escape liability for known risks "even if the harm ultimately was not averted." *Id.*

The Eleventh Circuit has recently heard a deliberate indifference claim brought by a "medically vulnerable subclass" of inmates who challenged the conditions of confinement in light of the COVID-19 pandemic. *See id.* at *1. The plaintiffs in *Swain* claimed that they "did not have enough soap or towels to wash their hands properly, waited days for medical attention, were denied basic hygienic supplies like laundry detergent and cleaning materials, and were forced to sleep only two feet apart." *Id.* (internal quotation marks omitted). Following the entry of a preliminary injunction by the district court, defendants appealed to the Eleventh Circuit, arguing that plaintiffs "failed to establish that they were entitled to a preliminary injunction." *Id.* at *3.

The Eleventh Circuit ultimately granted defendants' request to stay the district court's preliminary injunction. *Id.* at *7. In doing so, it made two important observations regarding the subjective component of the deliberate indifference test. First, the court held that the district court likely erred "by treating [defendants'] inability to 'achieve meaningful social distancing' as evincing a reckless state of mind." *Id.* at *4. According to the *Swain* decision "the inability to take a positive action likely does not constitute a state of mind" necessary to establish deliberate indifference. *Id.* Second, the court held that "defendants'

20

actions likely do not amount to deliberate indifference" because the record showed that defendants "adopted extensive safety measures such as increasing screening, providing protective equipment, adopting social distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures."  *Id.* at *5.

Here, as in *Swain*, BCJ and Glades have taken steps that make a finding of deliberate indifference unlikely.   Both BCJ and Glades have instituted comprehensive screening polices, s*ee* Ex. 1, ¶ 10; Ex. 2, ¶ 9, provided masks to detainees, s*ee* Ex. 1, ¶ 16; Ex. 2, ¶ 15, adopted social distancing where possible, s*ee* Ex. 1, ¶ 17; Ex. 2, ¶ 23, quarantined symptomatic detainees, s*ee* Ex. 1, ¶ 11; Ex. 2, ¶ 10, and enhanced sanitation, s*ee* Ex. 1, ¶ 16; Ex. 2, ¶ 15.   On this record, Glades and BCJ's actions "likely do not amount to deliberate indifference."  *See Swain*, 2020 WL 2161317, at * 4-5.   As such, Petitioners cannot carry their burden of showing that they are likely succeed on their deliberate indifference claim against Glades and BCJ.[7]

### 3.   Petitioners cannot show they will suffer irreparable harm

In order to obtain injunctive relief, Petitioners must also show "that irreparable injury is *likely* in the absence of an injunction."   *Winter v. Nat'l Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original).   "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive

---

7 Similarly, ICE has instituted polices to address the risk of infection that comes along with transfer between facilities.   Specifically, all detainees and staff are provided masks and required to wear them during transfer. Ex. 2, ¶¶ 38-39.   These policies, combined with ICE's cohorting policies employed at Glades, BCJ, and Krome, create a record on which the transfer issues raised by Petitioners likely do not amount to deliberate indifference.

relief as an extraordinary remedy that may only be awarded upon a clear showing that plaintiff is entitled to such relief." *Id.* As such, remote or speculative injuries do not suffice. *See Ruffin v. Great Dane Trailers*, 969 F.2d 989, 995 (11th Cir. 1992).

Here, Petitioners claim that their continued detention imposes a "heightened risk of dying or suffering long-term health consequences from this infection." Doc. 17 at 23. Petitioners do not claim to have contracted, or even been exposed to, COVID-19. And given the extensive measures put in place by BCJ and Glades, it is unlikely that will change. As such, the irreparable injury Petitioners claim and injunction is needed to prevent is purely speculative. Accordingly, Petitioners cannot meet their burden and the request for a TRO should be denied.

### 4. The Balance of Equities and Public Interest Favor Respondents

It is well-settled that the public interest in enforcement of United States immigration laws is significant. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant."); *see also Nken v. Holder*, 556 U.S. 418, 436 (2009) ("There is always a public interest in prompt execution of removal orders: The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and permit[s] and prolong[s] a continuing violation of United States law." (internal marks omitted)).

Petitioners ask the Court to declare their detention unconstitutional, despite the valid reasons and statutory basis for their detention and the fact that BCJ and Glades have implemented appropriate precautionary measures.   The implications of such an order would be far-reaching.   The disruptive effect of such an order would long survive the COVID-19 pandemic, and would serve to release many aliens slated for removal back into the general public.   This type of burden and attendant harm, and its potential impact on DHS operations nationwide, is too great to be permissible at this preliminary stage.   Because Petitioners cannot show that the balance of hardships and public interest tips in their favor, the Court should deny the request for preliminary relief.

## Conclusion

For the reasons stated above, the motion for a temporary restraining order should be denied.


Dated: May 22, 2020

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By:     */s/ David P. Sullivan*
DAVID P. SULLIVAN
Assistant United States Attorney
Florida Bar No. 0111166
2110 First Street, Suite 3-137
Fort Myers, Florida 33901
Telephone: (239) 461-2200
Facsimile: (239) 461-2219
Email: David.Sullivan3@usdoj.gov

23

**CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2020, I electronically filed the foregoing with the clerk

of the court by using the CM/ECF system which will send a copy to the following:

Daniel B. Tilley
ACLU Foundation of Florida, Inc.
4343 West Flagler Street, Suite 400
Miami, FL 33134
Email: Dtilley@ACLUFL.org

David C. Fathi
American Civil Liberties Union, National Prison Project
915 15th St. N.W., 7th Floor
Washington, DC 20005
Email: Dfathi@ACLU.org

Eunice H. Cho
American Civil Liberties Union Foundation, National Prison Project
915 15th St. N.W., 7th Floor
Washington, DC 20005
Email: Echo@ACLU.org

Joseph Longley
American Civil Liberties Union Foundation, National Prison Project
915 15th St. N.W., 7th Floor
Washington, DC 20005

Michael Tan
American Civil Liberties Union Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004

Omar C. Jadwat
American Civil Liberties Union Foundation, Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004

Rebecca Ojserkis
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor

New York, NY 10044

Vera Eidelman
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

Amien Gnolou Kacou
American Civil Liberties Union of Florida
4023 N. Armenia Avenue, Suite 450
Tampa, FL 33607
Email: Akacou@ACLUFL.org

                                                       *s/ David P. Sullivan*
                                                       DAVID P. SULLIVAN
                                                       Assistant United States Attorney