UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

_____

HERAUD ST. LOUIS,
LUIS MARCIAS-ARREDONDO,
THEOPHILUS BUCKNOR,
WILKENS DORIVAL,
MARK ANTHONY MONTAGUE,
ROMAINE ODEEAN WILSON and
LENNOX ROBINSON,

           Petitioners-Plaintiffs,

  v.

JIM MARTIN, Field Office Director, Miami
Field Office, U.S. Immigration and
Customs Enforcement, *et al.*,

           Respondents-Defendants.
_____

Case No. 2:20-cv-349-FtM-60NPM

## DECLARATION OF ASSISTANT FIELD OFFICE DIRECTOR CARDELL C. SMITH

I, Cardell C. Smith, Assistant Field Office Director (AFOD) make the following statements under oath and subject to the penalty of perjury:

1. I am employed by U.S. Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), and, as AFOD, I currently oversee the Baker County Detention Center (BCJ).  I have held this position since February 18, 2019.

2. I provide this declaration based on my personal knowledge, belief, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, employees of DHS contract facilities, and information portals maintained and relied upon by DHS in the regular course of business.

3. In my current position, I work closely with the Southern Correctional Medicine, which provides direct medical services to the detainee population in BCJ.  The Southern Correctional Medicine works closely with ICE Health Service Corps (IHSC) and their assigned Field Medical Coordinators (FMCs) who report to the Medical Case Management Unit.  The FMCs serve as medical consultants to the ICE field offices and oversee clinical services at Inter-Governmental Service Agreement (IGSA) facilities that house ICE detainees, including BCJ.

1

4. IHSC's FMCs ensure that the provision of medical care by contractors to the ICE detainees within the IGSA facilities meets detention standards, as required by the IGSA contract. The FMCs do not provide hands-on care or direct the care within the IGSAs but monitor the medical care and services provided by the contract facilities. Medical staff at the contract facilities are directly responsible for medical care at the facility.

5. IHSC comprises a multidisciplinary workforce that consists of U.S. Public Health Service Commissioned Corps (USPHS) officers, federal civil servants, and contract health professionals.

6. Since the onset of reports of Coronavirus Disease 2019 (COVID-19), ICE epidemiologists have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to field staff on screening and management of potential exposure among detainees. [1]

7. In testing for COVID-19, BCJ is also following guidance issued by the Centers for Disease Control and Prevention (CDC) to safeguard those in ICE custody and care.

8. On April 10, 2020, ICE ERO released its *ERO COVID-19 Pandemic Response Requirements* (PRR), a guidance document that builds upon previously issued guidance and sets forth specific mandatory requirements expected to be adopted by all detention facilities housing ICE detainees, as well as best practices for such facilities, to ensure that detainees are appropriately housed and that available mitigation measures are implemented during this pandemic.[2]

9. Each detainee is screened for disabilities upon admission into BCJ by a medical nurse. Identified disabilities are further evaluated and reasonable accommodations are provided as medically appropriate.

10. During intake medical screenings, detainees are assessed for fever and respiratory illness. Detainees are also asked questions based on a COVID-19 Screening Questionnaire, which includes questions regarding recent travel history, recent close contact with a person with laboratory-confirmed COVID-19 in the past fourteen days, or if they are showing symptoms such as a cough, fever, or loss of taste. Detainees are also asked whether they have traveled from or through area(s) with sustained community transmission in the past two weeks, as well as through areas with a high impact of COVID-19. Detainees are not allowed to enter the facility until they have been cleared by medical personnel.

11. Detainees diagnosed with any communicable disease who require isolation are placed in an appropriate setting in accordance with CDC or state and local health department guidelines. The detainee's intake responses and the results of these assessments will dictate whether to monitor or isolate the detainee. Detainees who present symptoms

---

[1] Specifically, ICE closely follows the CDC's *Interim Guidance on Management of Coronavirus 2019 (COVID-19) in Correctional and Detention Facilities* at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html, and its general public guidance at https://www.cdc.gov/coronavirus/2019-ncov/index.html.
[2] https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf.

2

compatible with COVID-19 will be placed in isolation in one of our four medical cells and accordingly tested. If testing is positive, the detainee will remain isolated and treated. Such medical cells are monitored by fifteen-minute check-ins, and staff often walk by the cells. The medical cells are also subject to camera surveillance, and each cell has a panic button for detainees to use to alert a nurse for immediate need. In case of any clinical deterioration, a detainee will be referred to the Ed Fraser Memorial Hospital in MacClenny, Florida for immediate care until bed space can be secured at the University of Florida Shand's Hospital in Gainesville, Florida, or the Jacksonville Memorial Hospital in Jacksonville, Florida.

12. In cases of known exposure to a person with confirmed COVID-19, asymptomatic detainees are placed in cohorts with restricted movement for the duration of the most recent incubation period (fourteen days after most recent exposure) and are monitored daily for fever and symptoms of respiratory illness. Cohorting is an infection-prevention strategy which involves housing detainees together who were exposed to a person with an infectious organism but are asymptomatic. As identified in the PRR, a cohort is a group of persons with a similar condition grouped or housed together for observation over a period of time. Given the significant variance in facility attributes and characteristics, cohorting options and capabilities will differ across the various detention facilities housing ICE detainees. At the BCJ, cohorting is achieved in the following manner: Normally, a group of detainees will be placed in cohorts if they were all simultaneously exposed to a person who has tested positive for COVID-19, or the group of detainees all arrived at BCJ at the same time and were all exposed simultaneously to a person who tested positive for COVID-19. If it involves a small group (four detainees or less), then the detainees are separated into pairs and isolated in a single cell for a period of fourteen-days under observation. If a larger group is exposed, the detainees will be isolated in a dormitory and will not have contact with the rest of the detainee population for the fourteen-day period. Detainees who do not develop symptoms after the fourteen-day period are cleared and released into the general detainee population. While a detainee is cohorted, confinement rounds are completed daily in order to allow detainees time to voice their concerns directly to medical staff. Since approximately April 15, 2020, BCJ has enacted a new measure of cohorting all new intake detainees that arrive at the facility. Two dormitories were specifically designated for this function. The detainees that are cohorted under this new measure are not suspected of COVID-19, nor suspected of being in contact with an individual who has tested positive for COVID-19. BCJ initiated this precautionary measure as an added safeguard to prevent infection in the detainee population. Detainees that have been cohorted are subject to a fourteen-day observation period, and are not allowed into the general population until the end of the observation period. Detainees are only allowed to join the rest of the population if they are asymptomatic and show no signs of a rise in body temperature,

13. BCJ has the following medical capabilities: BCJ manages both male and female detainees, and provides daily access to sick calls in a clinical setting, as well as access to specialty services and hospital care. BCJ also has a medical unit with four medical cells, including two negative air flow cells that can hold up to four detainees. These cells are used for isolation, as well as medical and mental health observation. 24/7 nursing care is provided by the facility, and the medical cells are within eyesight of the nursing station.

3

Fifteen-minute checks are conducted for all patients in the medical cells. Each cell is monitored by video surveillance, and equipped with an alarm button to use by a detainee to notify a nurse for immediate need. Specialty care providers are allowed into the facility to provide services, and, if necessary, transportation of detainees is available to the University of Florida Shands Hospital in Gainesville, Florida.

14. As 12:35 p.m. on May 20, 2020, BCJ has the following information:

    a. There are zero suspected cases of COVID-19 among ICE detainees at BCJ.

    b. There are zero confirmed cases of COVID-19 among ICE detainees at the BCJ.

    c. There are zero ICE detainees cohorted for being in contact with someone who has tested positive for COVID-19.

    d. There are zero suspected or confirmed cases of COVID-19 among BCJ staff members.

    e. BCJ offers voluntary testing for staff members. Currently, sixty-nine staff members have been tested, and all were negative for COVID-19.

    f. BCJ has test kits on site and readily available to use should an ICE detainee present symptoms suggestive of COVID-19.

15. BCJ is currently operating within the approved population guidelines and is not overcrowded. Currently, none of the dormitories that house detainees are overcrowded. As of May 21, 2020, the population is at 68% capacity for ICE detainees, in compliance with the PRR. Each dormitory in BCJ can hold up to thirty-two detainees, and beds are approximately six feet across from one another. Currently, no dormitory is filled to capacity. BCJ has not been up to 100% capacity for some time, however, between May 5, 2020 and May 6, 2020, and again from May 8, 2020 to May 15, 2020, certain temporary beds had to be set up in the common areas for a number of male detainees because the dormitories with available bed space were being used for female dormitories and cohorting. These actions were taken as part of BCJ's efforts to ensure that the new intake detainees that were being cohorted did not have any contact with any detainees from the general population. Currently, this issue has been addressed by transferring a number of detainees from BCJ to other ICE detention facilities. Currently, there are no detainees in temporary beds. The number for detainees per dormitory varies, but classification staff are making efforts to limit the number of detainees per dormitory.

16. BCJ has increased the frequency of sanitation and provides sanitation supplies as follows: Face masks were provided facility-wide on May 8, 2020 to all detainees. Face masks are also provided to all new intake detainees that arrive at BCJ. Face masks are exchanged weekly. Should a detainee's mask become soiled or unusable, it may be replaced immediately upon request to a staff member. Detainees are responsible for cleaning their own dormitory and bathroom units. Cleaning supplies used to be provided once a day for

4

each dormitory unit, however, since the COVID-19 pandemic began, supplies are now provided twice a day to each dormitory unit. These supplies include the approximate sized bottles:

   a. 32 oz bottle of Virex II 256,
   b. 32 oz bottle of Glance HC,
   c. 32 oz bottle of Crew NA- non acid bowl
   d. 32 oz bottle of bath cleaner.
   e. In response to the COVID-19 pandemic, each dormitory is also provided a 32 oz spray bottle of Neutral Germicidal Cleaner.

All of these supplies are provided twice a day for each dormitory, and replenishments can be requested as needed. Each dormitory is also provided twice a day with a mop and a bucket with water mixed with Stride Citrus HC. Detainees are also provided with a bar of soap once a week, and such can be replenished upon request. Inmate workers, who are also provided face masks as part of the general inmate population, are responsible for cleaning the common areas outside of the dormitory units which include recreational and multi-purpose room areas. These areas are cleaned throughout the day by the inmate workers.

17. Staff implement social distancing by encouraging smaller groups into the common areas such as the recreational and law library areas. On average, recreation areas have about four to five detainees at a time, and the law library averages two detainees per dormitory. Chairs in the common areas of the medical lobby are re-arranged to accommodate for six-foot distancing between patients waiting for treatments. Detainee movement is also limited as much as possible while still allowing for the basic needs of the detainees.

18. BCJ is currently restricting social visits from outside of the facility. BCJ, however, has increased phone time and video calls so that detainees may have social contact from outside of the facility. In addition, all gatherings and tours, including church services, are currently suspended. Transportation of detainees for purposes of dental cleaning and optometry appointments are also currently suspended in order to limit the risk of detainees coming into contact with infected individuals from outside of the facility.

19. BCJ has also limited professional visits to noncontact visits. Increased phone time and video calls is allowed in order for detainees to communicate with legal representatives. Legal representatives requesting face-to-face visits are still being scheduled during normal business hours but will be conducted with the use of PPE and through a glass petition.

20. BCJ screens all staff and vendors when they enter the facility. This screening includes body temperature checks, and is conducted on all administrative staff, contractors and maintenance workers prior to entering the building at the start of each workday.

21. BCJ screens all detainee intakes upon their arrival, including travel histories, medical histories, and checking body temperatures. Staff, as well as security officials, are advised

22. BCJ provides information on COVID-19 to its detainees by placing CDC flyers underlying the importance of hand-washing and social distancing.  The flyers are in English and Spanish, and are placed in the housing units, the intake and medical areas.  Detainees are also educated by security and medical staff on the importance of face masks and how to properly wear them.  Detainees are educated that masks can be worn on a voluntary basis, unless dealing with a quarantine unit.  Staff are required to wear face masks while dealing with cohorting dormitories, and all detainees in the cohorting dormitories are required to wear masks anytime they are out of their dormitory cell area.

23. BCJ has identified housing units for the quarantine of patients who are suspected of or test positive for COVID-19 infection, such as medical units and cells, as set forth in paragraphs 11, 12 and 13, *supra*.

24. ICE reviews its detained population of people who are "at higher risk for severe illness," as identified by the CDC,[3] to determine if detention remains appropriate, considering the detainee's health, public safety and mandatory detention requirements, and adjusted custody conditions, when appropriate, to protect health, safety and well-being of its detainees.

25. I have reviewed the procedural history of the cases of Petitioners Theophilus BUCKNOR and Wilkens DORIVAL for this case.

Petitioner Theophilus BUCKNOR

26. BUCKNOR is a native and citizen of Nigeria.  On October 6, 2006, he adjusted status to that of a Lawful Permanent Resident.  On April 19, 2013, BUCKNOR was arrested for Lewd and Lascivious Conduct on a Child under Sixteen Years of Age, and for Kidnapping a Child under Thirteen Years of Age.  BUCKNOR pled guilty to a lesser offense, and on or about August 26, 2013, BUCKNOR was convicted in the Circuit Court of the Eleventh Judicial Circuit in and for Miami Dade County, Florida for the offense of Child Abuse, No Great Bodily Harm, in violation of section 827.03(1) of the Florida Statutes.  BUCKNOR was sentenced to five years of probation.  (Case # 13-007224)

27. On February 3, 2014, BUCKNOR was issued a Notice to Appear (NTA) charging him as removable under section 237(a)(2)(E)(i) of the Immigration and Nationality Act (INA), as an alien who at any time after admission had been convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment.  On November 20, 2014, the Immigration Judge sustained the charge of removability as stated on the NTA.  On November 16, 2017, the Immigration Judge denied all applications for relief, and ordered BUCKNOR removed from the United

---

[3] See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.  The CDC includes in this list all individuals age 65 or older.  ICE expanded this to include all detainees age 60 or older.

States. On November 21, 2018, the Board of Immigration Appeals dismissed BUCKNOR's appeal, and BUCKNOR's removal order became final.

28. BUCKNOR was transferred to BCJ on or about April 29, 2020. In compliance with *Fraihat v. ICE*, 19-cv-01546 (C.D. Cal. Apr. 20, 2020), ERO has identified BUCKNOR as a subclass member due to the risk factor of diabetes, and he has undergone a custody determination. BUCKNOR is currently detained under the authority of 8 U.S.C. § 1231(a)(2). BUCKNOR is still within the 90-day removal period outlined in 8 U.S.C. § 1231(a)(1), which expires on or about June 13, 2020. The 180-day removal period expires on or about September 11, 2020. BUCKNOR is currently being processed for removal, and ERO has a pending request for a travel document.

Petitioner Wilkens DORIVAL

29. DORIVAL is a native and citizen of Haiti. On or about March 15, 2000, DORIVAL was admitted into the United States as a Lawful Permanent Resident.

30. On June 15, 2012, DORIVAL was convicted in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida for the offense of Burglary of a Dwelling, Grand Theft of $100 or More from Dwelling or Curtilage, Criminal Mischief and Resisting Officer Without Violence, in violation of sections 810.02(1)(B)(1), 810.02(3), 812.014(2)(D), 806.13(1)(B)(1) and 843.02 of the Florida Statutes. DORIVAL originally received a disposition of adjudication withheld for theses offenses. DORIVAL was subsequently arrested for violating his probation, and he was ultimately adjudicated guilty for the Burglary and Theft offenses on December 28, 2015. DORIVAL was sentenced to fifty-five months incarceration. (Case # 11-CF-015481)

31. On or about June 15, 2012, DORIVAL was convicted in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, for the offense of Robbery, in violation of section 812.13(2)(C) of the Florida Statutes. DORIVAL originally received a disposition of adjudication withheld. DORIVAL was subsequently arrested for violating his probation, and he was ultimately adjudicated guilty for the offense on December 28, 2015. DORIVAL was sentenced to fifty-five months of incarceration. (Case # 11-CF-015738)

32. On June 28, 2012, DORIVAL was convicted in the Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida, for the offense of Resisting an Officer with Violence, in violation of section 843.01 of the Florida Statutes. DORIVAL originally received a disposition of adjudication withheld. DORIVAL was subsequently arrested for violating his probation, and he was ultimately adjudicated guilty on December 28, 2015. DORIVAL was resentenced to fifty-five months of incarceration. (Case # 12-CF-005924)

33. On November 27, 2012, DORIVAL was convicted in the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida, for the offenses of Possession of Cannabis Less Than Twenty Grams and Resisting an Officer Without Violence in violation of sections 893.13(6)(B) and 843.02 of the Florida Statutes. DORIVAL received a

disposition of adjudication withheld for the offense of Possession of Cannabis Less Than Twenty Grams. DORIVAL was sentenced to ninety days of incarceration. (Case # 12-MM-010019)

34. On March 11, 2015, DORIVAL was convicted in the Circuit Court of the Ninth Judicial Circuit. in and for Orange County, Florida, for the offense of Delivery of Cannabis (Marijuana) for Consideration or More Than Twenty Grams, in violation of section 893.13(1)(A)(2) and 893.03(1)(C)(7) of the Florida Statutes. DORIVAL was sentenced to over fifteen months of incarceration. (Case # 14-CF-010681)

35. On May 16, 2019, DORIVAL was convicted in the Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida, for the offenses of Battery on a Law Enforcement Officer, Possession of Three Grams or Less of Synthetic Cannabis, and Possession of Drug Paraphernalia in violation of sections 784.07(2)(B), 893.13(6)(B) and 893.147(1) of the Florida Statutes. DORIVAL was sentenced to fifteen months of incarceration. (Case # 18-CF-005014)

36. DORIVAL has also been arrested and convicted for other offenses as a juvenile.

37. DORIVAL was issued an NTA and was ultimately charged as removable under sections 237(a)(2)(A)(ii), 237(a)(2)(B)(i), and 237(a)(2)(A)(iii) of the INA, as an alien who has been convicted of two or more crimes involving moral turpitude not arising out of a single scheme of criminal misconduct, as an alien who has been convicted of a controlled substance offense other than a single offense involving possession for one's own use of 30 grams or less of marijuana, and as an alien who has been convicted of an aggravated felony as defined under section 101(a)(43)(F) of the INA.

38. On August 26, 2019, an Immigration Judge sustained the three charges of removability. DORIVAL is currently in removal proceedings, and has an upcoming hearing with the Immigration Judge on June 5, 2020 at the Krome Service Processing Center (Krome SPC).

39. DORIVAL was transferred to BCJ on or about April 29, 2020. Due to his criminal convictions, DORIVAL was detained at BCJ under the authority of 8 U.S.C. § 1226(c). In compliance with *Fraihat*, ERO identified DORIVAL as a subclass member due to the risk factor of hypertension, and he underwent a custody determination while at BCJ.

40. Due to the need to decrease the overall detainee population, and DORIVAL's upcoming hearing with the Immigration Judge at Krome SPC, he was transferred out of BCJ on May 15, 2020. DORIVAL is currently detained at Krome SPC.

      I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and based on information obtained from other individuals employed by ICE.

DATED: May 22, 2020

_____
Cardell C. Smith

Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

9