UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

HERAUD ST. LOUIS, et al.,
        Petitioners-Plaintiffs,

v.                                                                                                           Case No. 2:20-cv-349

JIM MARTIN, et al.,
        Respondents-Defendants.

### REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER

With leave of the Court (ECF 31), Plaintiffs-Petitioners ("Petitioners") file this reply to Defendants-Respondents' ("Respondents") Opposition ("Resp.") (ECF 28) to Petitioners' Motion for Temporary Restraining Order ("Mot.") (ECF 17).

### Introduction

In their Opposition, Respondents either misstate or fail to contest—and therefore concede—key facts established in Petitioners' Motion regarding conditions at, and during transfers between, Respondents' detention centers, including the Glades County Detention Center ("Glades") and the Baker County Detention Center ("Baker"). This, coupled with new facts raised in the Opposition, provides further support for Petitioners' Motion.

**I.  Facts**

First, Respondents state that "as of May 21, 2020, [Baker] is at 68% capacity for ICE detainees" (ECF 28-1 ¶ 15) while "Glades is at 73% capacity" (ECF 28-2 ¶ 14). These generalized statements about each *facility* as a whole provide little cover for the facts presented by Petitioners regarding frequent crowding in their respective *dorms* (ECF 1-12 ¶¶ 7, 9, 11; ECF

1-8 ¶¶ 12-14;[1] ECF 1-14 ¶ 8; ECF 1-9 ¶¶ 6, 11-13; ECF 1-11 ¶¶ 9, 11; ECF 1-13 ¶¶ 13, 15). These generalizations are especially troubling given Respondents' simultaneous statement that they now use or intend to use spaces for "cohorting"—i.e., group quarantines at each facility (*see, e.g.*, ECF 28-1 ¶ 12, 28-2 ¶ 11). In the end, Respondents either partly confirm (ECF 28-1 ¶ 15) or otherwise fail to rebut evidence showing that each facility's population fluctuates frequently due to transfers and that, as a result, dorms at both facilities are frequently near, at, or above their designated capacity (ECF 1-3 ¶ 4.d, 26). Crucially, Respondents also confirm (ECF 28-2 ¶¶ 15, 16) or fail entirely to rebut Petitioners' specific allegations regarding their inability to practice social distancing where they sleep, eat, or must otherwise interact in groups of detainees (ECF 17 at 6–7).

Second, Respondents now reveal that "there has been one confirmed case of COVID-19 at Glades" involving a Sheriff's deputy, and that, as a result, some 336 detainees—around 80% of the facility's usual population (ECF 28-2 ¶ 13, ECF 1-3 ¶ 4.d)—is being cohorted as a "precautionary measure." This revelation confirms that, despite Respondents' alleged protocols, COVID-19 has already entered the facility, and underscores the remarkable danger posed by this disease where, by Respondents' own actions, even one positive case threatens hundreds of detainees. At the same time, Respondents fail to mention any special measures put in place to protect medically vulnerable detainees who are placed in such cohorts, despite Petitioners' specific allegations regarding Respondents' critical failures in this regard (ECF 1-3 ¶ 18).

---

[1] Respondents contend that Petitioner Heraud St. Louis' claims should be dismissed as moot because he was recently transferred into the custody of the Lee County Sheriff's Office based on an outstanding warrant (ECF 28 at n.3). However, Respondents have signaled their intent to either retain or resume at the first opportunity its custody of Mr. St. Louis, by lodging a detainer with the Sheriff while his removal proceedings are still pending (ECF 28-2 ¶ 27); therefore, Mr. St. Louis' claims are not moot. *See Christian Coalition v. Cole*, 355 F.3d 1288, 1291 (11th Cir. 2004) ("Only when the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated are federal courts precluded from deciding the case on mootness grounds") (quotations omitted); *cf. Roberts v. INS*, 372 F. App'x 921, 924 (11th Cir. 2010) (detainer was found not to establish custody for habeas purposes because removal proceedings had not been initiated).

Nor do Respondents provide any rebuttal to Petitioners' evidence that staff fail to wear protective equipment when interacting with detainees who are *not* in cohorts or quarantines (ECF 1-9 ¶ 17, 1-6 ¶ 4.f, 1-8 ¶ 20, 1-12 ¶ 15, 1-14 ¶ 13); that medically-vulnerable detainees are held with other—sometimes symptomatic—detainees for hours in close proximity both in dorms and during transfer in crowded buses (ECF 1-3 ¶ 23, 1-9 ¶ 8, 1-10 ¶ 14, *but see* 28-2 ¶ 39); and that Glades has failed to test—*after* intake—all detainees with symptoms of COVID-19 (ECF 1-9 ¶ 4; 1-13 ¶¶ 8, 9, 15, 19; 1-8 ¶ 19; 1-10 ¶ 16, *see also* Ex. 10 to ECF 1-15, ECF 1-2 ¶ 35.d, *but see* 28-2 ¶ 10). Respondents state that, at Baker, cleaning supplies are provided to detainees "twice per day" and that "common areas are cleaned throughout the day by inmate workers" (ECF 28 at 8), while, at Glades, "all dormitories are sanitized twice daily" (ECF 28 at 10). However, Petitioners have established that this cleaning and sanitizing does not occur consistently and that Respondents have little to no control over whether detainee workers—as opposed to facility staff—in fact clean or sanitize dorms and common areas (ECF 1-14 ¶ 12, 1-10 ¶ 14). Furthermore, these measures are patently inconsistent with CDC guidance that Respondents claim to closely follow (ECF 28-1 n.1 & 28-2 n.1), which calls for cleaning "several times per day" (Ex. 6 to ECF 1-15 at 9); *see also* Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/several (defining "several" as "more than two").

Finally, Respondents' vague statement that soap provided to detainees at Glades is replenished "as needed" does not address Petitioners' specific evidence that the soap they receive is insufficient, runs out frequently, and is too slowly replenished (ECF 1-8 ¶¶ 16, 17; 1-9 ¶ 8; 1-13 ¶ 16; 1-10 ¶ 14; 1-12 ¶¶ 12, 15; 17-1 ¶ 7).

Respondents have transferred one Petitioner to Krome Service Processing Center during the course of this litigation. Krome, which has implemented identical COVID-19 prevention protocols issued by ICE likewise faces an outbreak of COVID-19: as of May 22, 2020, 13 detainees have confirmed cases of the virus (Ex. 9 to ECF 1-15, https://www.ice.gov/coronavirus).

## II.     This Court has the power to release Petitioners.[2]

Respondents contend that *Gomez v. United States*, 899 F.2d 1124, 1126-27 (11th Cir. 1990), and *Vaz v. Skinner*, 634 F. App'x 778, 781 (11th Cir. 2015), bar release as a remedy. *Gomez* and *Vaz*, however, are inapposite. Indeed, Petitioners have established, and Respondents do not contest, that there is no known treatment or cure for COVID-19 (ECF 1-2 ¶ 6 & 1-1 ¶ 11). By contrast, *Gomez* explicitly concerned a situation where the government showed that the petitioner's medical condition could be adequately treated by prison authorities. *See* Mot. at 21-22.  Second, Petitioners challenge the *fact* of their detention. If no legal conditions of detention exist, it is necessarily the fact of detention itself that becomes illegal. That is the realm of habeas, and immigrant detainees may be released under 28 U.S.C. § 2241 (habeas) in light of COVID-19. *See Dada v. Witte*, No. 1:20-cv-00458-SECP, Dkt. 24 at 2 (W.D. La. May 22, 2020) ("Despite Respondent's best efforts to convince this court that this case is a conditions of confinement case rather than a fact of confinement case, we find otherwise"); *see also Vazquez Barrera v. Wolf*, No. 4:20-cv-1241, 2020 WL 1904497, at \*3–\*4 (S.D. Tex. Apr. 17, 2020); *Bent v. Barr*, No. 19-cv-06123, 2020 WL 1812850, at \*2 (N.D. Cal. Apr. 9, 2020); *Ortuno v. Jennings*, No. 20-CV-02064-MMC, 2020 WL 1701724, at \*2 (N.D. Cal. Apr. 8, 2020); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at \*2-\*3 (E.D. Mich. Apr. 5, 2020); *Coreas v.*

---

[2] Respondents do not contest this Court's authority to release Petitioners regardless the statutory basis of their detention (ECF 17 ¶ 4).

*Bounds*, _ F. Supp. 3d _, 2020 WL 1663133, at *7 (D. Md. Apr. 3, 2020); *cf. Wilson v. Williams*, _ F. Supp. 3d _, 2020 WL 1940882, at *6 (N.D. Ohio Apr. 22, 2020) (where the court found circuit precedent similar to *Gomez* inapplicable); *Antonelli v. Warden, U.S.P. Atlanta*, 542 F.3d 1348, 1352 (11th Cir. 2008) ("[C]hallenges to the execution of a sentence, rather than the validity of the sentence itself, are properly brought under § 2241."). Respondents offer no response to this argument. Release is proper here.

### III. Petitioners are likely to succeed on the merits of their claim.[3]

#### A. Petitioners' detention constitutes unconstitutional punishment.

As Respondents recognized, due process requires that those in civil detention "not be punished." Resp. at 14 (citation omitted). Contrary to Respondents' assertion, government attempts to improve conditions do not disprove the presence of punishment[4]; the fact that "a condition of pretrial detention is not reasonably related to a legitimate government goal" is enough to infer intent. *McMillian v. Johnson*, 88 F.3d 1554, 1564 (11th Cir. 1996).

Respondents invoke the general constitutionality of ICE detention, Resp. at 15–16, but they do not specifically address the central claim at issue here: that the risk of serious illness and death faced by Petitioners in light of COVID-19 outweigh the government's legitimate purposes. *Cf. Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (questioning indefinite detention's constitutionality). Moreover, Petitioners have readily shown that the government's legitimate

---

[3] Respondents suggest a higher standard is required where Petitioners seek a "mandatory" injunction. Resp. at 13-14. Not so. The distinction between action and inaction is not as clear as Respondents suggest, and an injunction is not mandatory merely because any action at all must be taken. Consider the preliminary injunction from *McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998). Requiring someone to gather, package, and mail materials is certainly an action. And ceasing operation of a restaurant involves dozens of actions. Yet the Eleventh Circuit found this to be a prohibitory injunction, not a mandatory one. *Id.* at 1306–07 & n.2; *see also Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996) (describing a prohibitory injunction as "one that 'restrains' a responsible party from further violating [the law]"). Here, the requested injunction is not mandatory simply because ICE must unlock the front door to let Petitioners out. If ceasing operation of a restaurant is a prohibitory injunction, so too is ceasing detention. And not transferring Petitioners is plainly prohibitory.

[4] Respondents make no such argument with respect to Krome.

5

interest in protecting the public and ensuring their removal can be accomplished by a number of means other than physical detention. *See* Pls. TRO at 12–13. But detention that threatens to impose a death sentence—even worse than the "indefinite detention" questioned by the Supreme Court in *Zadvydas*, 533 U.S. at 690—cannot be the government's approach.

Respondents' reliance on *Matos v. Lopez Vega*, _ F. Supp. 3d _, 2020 WL 2298775 (S.D. Fla. May 6, 2020), for the contrary proposition is unavailing. *Matos* addressed conditions and government efforts at a different facility—the Broward Transitional Center (BTC)—when "most significantly" there were zero suspected or confirmed cases of COVID-19. *Id.* at *2, *4. Less than a month later, there are now 19 cases at BTC (Ex. 9 to ECF 1-15, https://www.ice.gov/coronavirus). Moreover, declarations in *Matos* were submitted by individuals who had not been in the facility for some time—and in one case for over a year. 2020 WL 2298775, at *9. In contrast, here Petitioners have submitted declarations describing their *current* troubling conditions. In addition, *Matos* concluded that continued detention in that case was reasonably related to a legitimate purpose in part because "each Petitioner is expected to be deported within the month," potentially limiting the risk they face. *Id.* at *10. Here, Petitioners remain at risk for the foreseeable future.

### B. *Youngberg* applies to civil detainees like Petitioners.

Respondents appear to contend that the professional judgment standard from *Youngberg v. Romeo*, 457 U.S. 307 (1982), only applies to a "permanently civilly committed, and intermittently violent adult who was incapable of maintaining himself or defending himself against himself or others." Resp. at 18 (quoting *Hughes v. Judd*, 108 F. Supp. 3d 1167, 1180 (M.D. Fla. 2015)). But *Hughes* predates *Hood v. Dep't of Children & Families*, 700 F. App'x 988 (11th Cir. 2017), where the Eleventh Circuit explicitly held that Youngberg applies to "civil

detainees." *Id.* at 990 n.1. The court did not adopt the limitation mentioned in *Hughes*. Nor does the limitation in *Hughes* describe the type of detention in *Hood* itself; the Florida Civil Commitment Center is a treatment center,[5] not a facility for permanent/lifetime civil commitment. Like the detainees in *Hood*, Petitioners are civil detainees who have served their time for any crimes, yet are being *temporarily* held in civil detention for some other purpose. Respondents offer no response to *Hood*'s statement that *Youngberg* applies to civil detainees like Petitioners.

### C. Petitioners have satisfied the (inapplicable) deliberate indifference standard.

Respondents do not contest Petitioners' argument that, as civil detainees,[6] they need not establish the more onerous deliberate indifference standard to show liability (ECF 28 at 14-17), *see also McMillian*, 88 F.3d at 1564; *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004). Nonetheless, Respondents argue that Petitioners would fail to meet that standard, in light of *Swain v. Junior*, No. 20-11622-C, 2020 WL 2161317 (11th Cir. May 5, 2020). But unlike Petitioners in the instant action, the plaintiffs in *Swain*, who were pretrial detainees, did not allege that the defendants in their case were aware not just of the danger posed by COVID-19 to medically-vulnerable detainees but also of the inadequacy of the resources at their disposal to protect such detainees. *Cf. Gayle v. Meade*, No. 20-cv-21553, 2020 WL 2086482, at *4 (S.D. Fla. Apr. 30, 2020) ("[I]t is clear that ICE fully understands the benefit of reducing the detainee population"; by failing "to commit to addressing the conditions complained of, ICE has demonstrated deliberate indifference."). Specifically, here, Respondents have publicly acknowledged the insufficiency of their testing resources (Ex. 10 to ECF 1-15 at 1-2) but, as

---

[5] *Recovery Solutions: Florida Civil Commitment Center*, Wellpath, https://wellpathcare.com/recovery-solutions-locations/florida-civil-commitment-center-fccc/.
[6] Respondents briefly misstate that Petitioners, who are civil detainees, are "pretrial detainees" (ECF 28 at 19).

detailed above, continue to transfer and detain medically vulnerable people with groups of other detainees who have not been tested for COVID-19. Moreover, unlike the response of defendants in *Swain* to COVID-19, the Respondents' "systemwide" response was found by a federal court to have been "lethargic" a month ago and, just days ago, to remain so. *Fraihat v. U.S. Immigration & Customs Enf't*, No. 5:19-cv-01546, Dkt. 150 at 5 (E.D. Cal. May 15, 2020) ("[T]he Court is concerned that Defendants continue to slow walk their systemwide pandemic response."). Courts in this circuit, and this district, have found that detention officials exhibit deliberate indifference when they delay providing needed relief, even when they otherwise take steps to respond to such need. *See Harper v. Lawrence Cty.*, 592 F.3d 1227, 1235 (11th Cir. 2010); *Rosemarie M. v. Morton*, 671 F. Supp. 2d 1311, 1313 (M.D. Fla. 2009).

Finally, Respondents are also aware of findings by the Department of Homeland Security's Inspector General regarding their failure to provide adequate oversight of their contractors at Glades and Baker, resulting in conditions that "jeopardize the safety and rights of detainees." (Ex. 13 to ECF 1-15). As a result, they are unlikely to quickly address, for example, failure by detention staff at these facilities to comply with public health guidelines by failing to wear at all times (and to frequently replace) protective equipment when interacting with detainees (ECF 1-10 ¶ 24; 1-9 ¶¶ 9, 17; 1-8 ¶ 20; 1-14 ¶ 13). Meanwhile, Petitioners' chances of a fatal infection with COVID-19 multiply each day.

**IV. Denying Petitioners relief will cause irreparable harm.**

Respondents cannot, and do not, dispute that contracting COVID-19 would be tragic for Petitioners in light of their medical vulnerability. Despite Respondents' unsupported contentions that it is "speculative" whether Petitioners will contract COVID-19, Resp. at 22, a recent study concluded that even under the most optimistic projections 72-99% of immigrant detainees will

be infected within 90 days. Michael Irvine et al., *Modeling COVID-19 and Impacts on U.S. Immigration and Enforcement (ICE) Detention Facilities*, J. Urban Health (in press). Further, Respondents' assertion that Petitioners have not been exposed to COVID-19 is meaningless when the facility has barely conducted testing—even of symptomatic detainees (ECF 1-9 ¶ 4; 1-13 ¶¶ 15, 19; 1-8 ¶ 19; 1-10 ¶ 16; *see also* Ex. 10 to ECF 1-15; ECF 1-2 ¶ 35.d; *but see* ECF 28-2 ¶ 10). It is also belied by the fact that Respondents are currently cohorting hundreds of Glades detainees following the recent introduction of the COVID-19 virus into the facility despite Respondents' alleged protocols (ECF 28-2 ¶ 13). Due to their medical vulnerabilities, Petitioners are at risk of irreparable harm—serious illness or death—if exposed to this virus. *See, e.g.*, *Basank v. Decker*, _ F. Supp. 3d _, 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020).

**V.     The balance of the equities and the public interest favor Petitioners.**

The public interest counsels in favor of granting Petitioners' TRO. An order denying relief could be a matter of life or death. Respondents ignore the fact that release would not only benefit the health and lives of Petitioners, but also preserve precious health care resources for the local community. Moreover, the government's interest in enforcing immigration laws is in no way undermined by Petitioners' release. Petitioners would still be subject to immigration proceedings, and appropriate conditions of release could be set to ensure compliance. *See, e.g.*, Ex. 16 to ECF 1-15, at 30, https://www.gao.gov/assets/670/666911.pdf (reporting a 99% attendance rate at all immigration court hearings and a 95% attendance rate at final hearings under an ICE alternative to detention program). Given the effective alternatives to detention available, the equities and public interest clearly counsel in favor of releasing Petitioners.

## Conclusion

For the reasons stated, the motion for a temporary restraining order should be granted.

Dated: May 23, 2020                                    Respectfully Submitted,

|  |  |
|---|---|
|  | */s/ Amien Kacou* |
| David C. Fathi** | Amien Kacou, Fla. Bar No. 44302 |
| Eunice H. Cho** | TRIAL COUNSEL |
| Joseph Longley*** | Daniel Tilley, Fla. Bar No. 102882 |
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION, NATIONAL PRISON PROJECT | AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF FLORIDA |
| 915 15th St. N.W., 7th Floor | 4343 West Flagler Street, Suite 400 |
| Washington, DC 20005 | Miami, FL 33134 |
| 202-548-6616 | (786) 363-2714 |
| dfathi@aclu.org | akacou@aclufl.org |
| echo@aclu.org | dtilley@aclufl.org |
| jlongley@aclu.org |  |
|  | Vera Eidelman* |
| Michael Tan* | Rebecca Ojserkis* |
| Omar C. Jadwat*** | AMERICAN CIVIL LIBERTIES UNION FOUNDATION |
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION, IMMIGRANTS' RIGHTS PROJECT | 125 Broad Street, 18th Floor |
| 125 Broad Street, 18th Floor | New York, NY 10004 |
| New York, NY 10004 | (212) 549-2600 |
| (212) 549-2600 | veidelman@aclu.org |
| mtan@aclu.org | rojserkis@aclu.org |
| ojadwat@aclu.org |  |

*\* Admitted pro hac vice.*
*\*\* Admitted pro hac vice; not admitted in DC; practice limited to federal court.*
*\*\*\* Motion to appear pro hac vice forthcoming; not admitted in DC; practice limited to federal court.*

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the foregoing motion via the Court's ECF filing system and via email courtesy copy to the office of the United States Attorney for the Middle District of Florida.

Dated: May 23, 2020                                    */s/ Amien Kacou*
                                                                            Amien Kacou